**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| MICHAEL DEAN GONZALES, | § | |
| | § | |
| | § | CASE NO. _____ |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | **DEATH PENALTY CASE** |
| WOODSON ERICH DRYDEN, | § | |
| Ector County District Attorney Pro Tem; | § | |
| | § | |
| MICHAEL GERKE, Chief, | § | **EXECUTION DATE: MARCH 8, 2022** |
| Odessa Police Department; | § | |
| | § | |
| STEVEN MCCRAW, Director, | § | |
| Texas Department of Public Safety; | § | |
| | § | |
| *Defendants.* | § | |

**COMPLAINT PURSUANT TO 42 U.S.C. § 1983**

Richard Burr
Texas Bar No. 24001005
Burr and Welch, PC
PO Box 525
Leggett, TX 77350
713-628-3391
dick@burrandwelch.com

*Counsel for Michael Dean Gonzales*

## INTRODUCTION

1.     Plaintiff Michael Dean Gonzales is scheduled to be executed on March 8, 2022 for the capital murder of Manuel and Merced Aguirre in April 1994. Mr. Gonzales has maintained his innocence. Despite Mr. Gonzales' diligent efforts in state court, Defendants have denied Mr. Gonzales access to DNA testing of critical evidence in the Defendants' custody that would enable Mr. Gonzales to demonstrate the violation of his constitutional rights and his wrongful conviction. This suit is brought to enjoin Defendants from violating Plaintiff's federal constitutional rights by denying him access to that exculpatory evidence and foreclosing his ability to prove his entitlement to relief from his conviction under available state and federal post-conviction remedies.

2.     Defendants have denied Mr. Gonzales access to DNA testing of biological evidence in their possession that could establish his innocence. "Modern DNA testing can provide powerful new evidence unlike anything known before." *Dist. Attorney's Office v. Osborne*, 557 U.S. 53, 62 (2009). The Texas Legislature has recognized the utility of DNA evidence in the post-conviction context and passed Chapter 64 of the Texas Code of Criminal Procedure in 2001.

3.     On December 21, 2020, Mr. Gonzales moved for DNA testing under Chapter 64 of the Texas Code of Criminal Procedure ("Chapter 64"). His request was denied by a Texas

1

district court.[1] Mr. Gonzales sought DNA testing of hair and blood evidence collected from the crime scene, blood samples collected from suspects' clothing by the police, the fingernail scrapings collected from the victims in this case, and other biological materials that would exclude Mr. Gonzales, and identify one or more third-party individuals as the perpetrator or perpetrators responsible for the deaths of Manuel and Merced Aguirre. In fact, some of the evidence collected during the investigation was subjected to now-outdated DNA testing performed in 2000. In that previous testing, every item tested that contained interpretable amounts of DNA excluded Mr. Gonzales.

4.      This action under 42 U.S.C. § 1983 challenges the constitutionality of Chapter 64 both on its face and as applied by Texas courts to the circumstances of Mr. Gonzales' case. Given the unique ability of DNA evidence to identify the actual killer in this case, the State's refusal to allow Mr. Gonzales to test key evidence in its possession denies him due process of law and access to the courts. Defendants' refusal to release biological evidence for testing violates Plaintiff's Fourteenth Amendment right to due process, his First Amendment right to access the courts, and his Eighth Amendment right to be free from cruel and unusual punishment.

---

[1] Mr. Gonzales has an appeal as of right from the denial of his motion for DNA testing. That appeal remains pending before the Texas Court of Criminal Appeals. *See Gonzales v. State*, No. AP-77,104 (Tex. Crim. App.) (case submitted Jan. 26, 2022).

Mr. Gonzales will refer throughout this Complaint to exhibits, which will be filed in an Appendix to the Complaint forthwith.

Trial transcripts and the clerk's record from the 1995 trial and 2009 resentencing trial will be denoted throughout and are filed with the District Court in the related federal habeas action from the same underlying state court conviction, *Gonzales v. Davis*, No. 7:12-cv-00126-DAE (W.D. Tex.).

5.      Plaintiff requests an order declaring that Defendants' continued withholding of these categories of evidence violates Plaintiff's constitutional rights and requiring that Defendants allow inspection of the physical exhibits and release the biological evidence to an accredited forensic laboratory for testing under a reasonable protocol for the chain of custody and preservation of the evidence, so Plaintiff can have the evidence tested at his own expense. Relief is necessary here to preserve Plaintiff's liberty interest in accessing the Texas statutory procedure to conduct forensic DNA testing and the Texas post-conviction remedy for habeas relief.

## JURISDICTION

6.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202, and under 42 U.S.C. § 1983. *See also Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (convicted state prisoner may seek DNA testing of crime-scene evidence in § 1983 action).

## VENUE

7.      Venue lies in this Court under 28 U.S.C. § 1391 because the injury by the Defendants to the Plaintiff occurred in Western District of Texas through the refusal of Defendants Dryden and Gerke to provide the Plaintiff access to or testing of the requested evidence.

## PARTIES

8.      Plaintiff Michael Gonzales is a United States citizen and resident of the State of Texas. He is incarcerated, under a sentence of death imposed by the 358th Judicial District Court of Texas, at the Allan B. Polunsky Unit of the Texas Department of Criminal Justice ("TDCJ") in Livingston, Texas. He is scheduled to be executed on March 8, 2022.

9.      Defendant Erich Dryden is the District Attorney Pro Tem for the 358th Judicial District of Texas.[2] He is being sued in his official capacity. Defendant Dryden has custody and/or control of the DNA evidence that is the subject of the DNA claim. He also has custody and/or control of the Defendant Gallivan has opposed Mr. Gonzales' request to conduct DNA testing on the items of evidence at issue in this case. A district attorney who opposes DNA testing is a proper defendant in a § 1983 action seeking DNA testing. *Skinner*, *supra*.

10.     Defendant Michael Gerke is the Chief of the Odessa Police Department. Defendant Gerke has custody of certain evidence designated below. Defendant Gerke is sued in his official capacity.

11.     Defendant Col. Steven McCraw is the Director of the Texas Department of Public Safety. The crime laboratory of the Texas Department of Public Safety in Austin, Texas conducted previous DNA testing of evidence in this case and has custody of certain evidence designated below. Defendant McCraw is sued in his official capacity.

## **FACTUAL AND LEGAL BACKGROUND[3]**

## I.    **PHYSICAL EVIDENCE AND ALTERNATE SUSPECTS IN THE AGUIRRE HOMICIDE INVESTIGATION.**

12.     After 9 a.m. on the morning of April 22, 1994, Manuel Aguirre, Jr., discovered his parents, Merced and Manuel Aguirre, stabbed to death in their home in Odessa, Texas, OPD Report on Discovery of Victims (Exhibit 7).

---

[2] District Attorney Pro Tem Dryden is appointed under Texas Code of Criminal Procedure 2.07 in place of the elected Ector County District Attorney. Mr. Gonzales moved to terminate Mr. Dryden's appointment as attorney pro tem. The state district court denied the motion. Mr. Gonzales has moved to file a petition for writ of mandamus in the Texas Court of Criminal Appeals (CCA) to direct the state district court to terminate Dryden's appointment, which remains pending. *See In re Gonzales*, No. WR-40,541-05 (Tex. Crim. App.) (filed Nov. 18, 2021).

[3] This Complaint concerns the unconstitutional denial of post-conviction DNA testing necessary for an  innocent individual to secure relief from his conviction. It is necessary to allege

13.     From the moment the Odessa Police Department (OPD) began its investigation of the murders, police investigators focused on next-door-neighbor Michael Gonzales as the prime suspect. But Gonzales, who lived with his mother, denied knowledge of the murders, and none of the physical evidence police obtained pointed to him. The police generated incriminating evidence about alternate suspects Jesse Perkins, Daniel Lugo, and Julian Olivarez, but failed to investigate and develop physical evidence about those suspects.

**A.     Police investigate the crime scene but fail to collect or document some physical evidence.**

14.     On April 22, police documented evidence at the crime scene and canvassed the surrounding area. Police learned that a camera, stereo, microwave, VCR, and gun were missing from the Aguirres' home, Report of Det. Robertson on Stolen Items (Exhibit 8).

15.     A bloodstain pattern analyst reported that Merced Aguirre had defensive wounds consistent with a struggle. Bloodstain Pattern Analysis Report of Sgt. Rick Pippins at 2 (Exhibit 9). He noticed drips of blood in the utility room close to where the bodies were discovered that were consistent with falling from the "person" of the killer. *Id*. at 20. The analyst noted the same drip pattern on the bottom of Mrs. Aguirre's housecoat, as though blood had dripped while the killer was standing over her fallen body. *Id*. The police failed to collect or photograph the drips of blood in the utility room. While Mrs. Aguirre's housecoat was submitted for DNA testing, the drips of blood on it do not appear to have been among the bloodstains tested.

16.     When night fell, police tested surfaces with luminol, which luminesces in the presence of unseen human blood.  Reports of Cpl. Rexer at 1 (Exhibit 10). Police noted a track of

---

in detail the facts concerning the investigation of the Aguirre murder and the evidence used to convict Mr. Gonzales.

footprints across the carpeted floor of the Aguirre living room and out the front sliding glass door. They did not take photographs of these prints. *Id*.

17.     Police also said they saw large areas luminesce in the Aguirres' master bathroom, suggesting there was human blood in the sink and bathtub. Report of Det. Robertson on April 23 Luminol Testing at 3 (Exhibit 11). Police photographed the bathroom luminol reaction, but the photographs have never been disclosed to the defense and may be lost.

18.     Police noticed bloody handprints on the wall by the body of Mrs. Aguirre. *Id*. They found several footwear impressions at the scene, including near Mrs. Aguirre's body. Ex. 10 at 1 (April 22 Rexer Report). Police gathered latent fingerprints from the sliding glass door at the front of the house and on numerous objects inside. *Id*. at 1, 3-4.

**B.     Based on the accusation of the man who possessed the Aguirres' stolen goods, OPD arrests Gonzales.**

19.     Police learned that Julian Olivarez had several of the Aguirres' stolen items, including the VCR, stereo, and microwave at his house. Julian Olivarez Statement, May 6, 1994 (Exhibit 12). Olivarez was a friend of Perkins and Lugo. 16 RR-T 244. He would get together with them to "drink" and "mess around." *Id*. Police retrieved the VCR and microwave from Olivarez's home. He told the police he saw the items at Gonzales' house the morning after the murders. Ex. 12 at 1 (Olivarez statement).

20.      Because Olivarez shifted the spotlight from himself by claiming Gonzales sold him those items, the police arrested Gonzales and searched his home. Again, police discovered nothing in Gonzales' house connecting him to the murder—no stolen property and no biological evidence. Report of Ranger Sanders on Search of Gonzales Home (218 Schell) (Exhibit 13). Among other items, police seized a bowl of salsa. *Id*. ¶ 150. They believed the salsa contained chile peppers similar to those found on the floor next to the body of Mrs. Aguirre. OPD Report

on Collection of Evidence from 218 Schell (Exhibit 14). They cut out some areas of carpet that were later determined by the DPS crime lab not to have blood and took the elbow traps from the kitchen and bathroom sink. Ex. 13 ¶ 153 (Sanders Report); January 13, 1995 DPS Preliminary Report at 3 (Exhibit 15).

## C. Police fail to investigate numerous alternate suspects.

21.     At the start of the investigation, Gonzales agreed to allow police to search his body for clues that would connect him to the murder. 20 RR-T 29, 31-33 (reporter's record of the testimony of criminalistics technician Brett Lambert in motion for new trial, Feb. 8, 1996). Because it is common for perpetrators to wound themselves in stabbing cases, the police photographed his arms and hands, looking for injuries. Police Photographs of Gonzales' Arms and Hands, April 22, 1994 (Exhibit 16). They found none. Later, other officers were assigned to canvass nearby hospitals for patients with laceration wounds. OPD Report on Hospital Canvass for Laceration Wounds (Exhibit 17).

22.     The police drew blood and took hair samples from Gonzales for future testing and comparison. 20 RR-T 31. They then applied the chemical luminol to Gonzales' arms and hands—a highly unusual procedure. 20 RR-T 30-31. The luminol testing showed no sign of blood, except in the spot where the police had just drawn a blood sample. 20 RR-T 31.

23.     On May 4, the mother of an acquaintance of Gonzales, Jesse Perkins, told police that, roughly an hour before the police were called to the Aguirres' house, Perkins' best friend, Daniel Lugo, went to Jesse's house and asked his mother "if the police had been informed about the bodies" at the Aguirre residence. 15 RR-T at 125-26. A few days later, the police recovered the Aguirres' stolen stereo from Lugo. *Id.* at 126. Although Lugo was, as the lead investigator testified, "the one that we obtained the stereo from," *id.* at 144, he was not charged in the case. *Id.* at 144.

24.     The police also talked to Perkins. In fact, Perkins, who was on probation for a burglary conviction, was interviewed by police on three occasions in 1994—on May 5, May 10, and December 6. *See* May 5, 1994 Jesse Perkins Statement (Exhibit 18); May 10, 1994 Jesse Perkins Statement (Exhibit 19); and Transcript of December 6, 1994 Interview with Jesse Perkins (Exhibit 20). Perkins was treated as a suspect. In each police statement, Perkins gave different stories, each one more incriminating than the last.

25.     ***First interview.*** When police first spoke with Perkins on May 5, he had what appeared to be blood on his pants. Report of Det. Robertson on First Interview of Perkins, May 5, 1994 at 1 (Exhibit 21). That blood, however, was not tested until 2000, five years after Gonzales' conviction, when numerous stains on his left pant leg were confirmed to be his blood. *See* Part III *infra* (discussing 2000 DNA testing). Detective Robertson would also later recall that "Perkins had a small cut on his left wrist."

26.     ***Second interview.*** In his second, Perkins said that he received a flannel shirt from Gonzales on the night of the murder. Report of Det. Robertson on Second Interview of Perkins, May 10, 1994 (Exhibit 22). The next day, Perkins' house was searched, and police found a XXXL, insulated "multi-colored flannel shirt" with stains on the front and cuffs. Report of Det. Robertson on Search of Perkins' Residence, May 11, 1994 (Exhibit 23).

27.     The day after the second interview, Perkins' parole was revoked, and he was booked into the Ector County jail. During booking, the sheriff's deputies noted a scar on Perkins' lower left arm. Jesse Perkins' May 6, 1994, Ector County Jail Booking Card (Exhibit 24). Notably, jailers had noticed no scar on Perkins' left arm when he was last booked into the county jail in September 1993. Jesse Perkins' September 2, 1993, Ector County Jail Booking Card (Exhibit 25). Although the police knew that the attacker or attackers they were looking for likely

had wounds to their hands and arms, they failed to photograph Perkins' wounds in May 1994, when they would have still been fresh.

28.     In October, over five months after Perkins' second statement and after a long break in the investigation, Det. Robertson inexplicably recalled the suspicious cut on Perkins' left wrist when he was first interviewed. In December 1994, Robertson obtained a search warrant to take Perkins' blood and hair samples to compare to items found at the crime scene. In seeking the warrant, Robertson declared he believed Perkins "caused, or assisted in causing the death" of the Aguirres. *See* CR-T 334. At the same time, Robertson interviewed Perkins for the third time and had photographs taken of his arms.

29.     ***Third interview.*** At his third interview, Perkins was finally asked about the wounds on his arms. Police also photographed the scars on Perkins' arms. Photographs of Jesse Perkins' Scars, Dec. 6, 1994 (Exhibit 26). Perkins said that he suffered one of the large cuts to his arms in an earlier burglary for which he was on probation and one from "metal sheet blinds" covering windows at his work at a car wash.[4] Ex. 20 at 29-31 (Dec. 6 Perkins interview). However, Perkins placed himself *in* the Aguirres' house on the night of the murder, for the first time.[5] *Id*. at *5 ("So that's how I got into the house."). Perkins' mother told police that her son told her he was not just in the house but was present for the murders and witnessed the stabbings.

30.     Thus, by December 6, 1994, OPD knew that:

---

[4] It is unclear which wound is being described from the transcript available to counsel. Although Det. Robertson alludes to a previous time questioning Perkins about his wounds, there is no record of it in Sanders or Robertson's reports.

[5] Perkins also told Det. Robertson that Gonzales and Lugo made incriminating statements in his presence at Gonzales' residence on the night of the murder. However, Perkins' account appears to have been deemed unreliable by Det. Robertson due to numerous inconsistencies between Perkins' recollection of events and the facts.

- While Gonzales did not have the wounds one would expect to find had he committed a stabbing crime, Jesse Perkins did;

- While no clothing seized from Gonzales' home had blood on it, both a flannel shirt in Perkins' closet and a pair of pants Perkins was wearing had what appeared to be blood on them;

- While Gonzales denied being the killer, a friend of Perkins, Lugo, seemed to suggest he knew something about it, and Perkins himself admitted he was present when the murders occurred.

31.    OPD did not charge Perkins in connection with the murders.

**D.    Police gather numerous pieces of physical evidence with biological material, but no DNA testing is reported.**

32.    During the homicide investigation, investigators collected dozens of pieces of evidence. These items were tracked in a "property invoice log." OPD Property Invoice Log No. 38775 (Exhibit 27). Many of these items contained or were likely to contain biological materials, including bloodstain evidence from the crime scene and Perkins' clothing, along with hair, fingernails, and other biological materials from the Aguirres. Police also reported collecting approximately 80 latent print cards, identified multiple footprints in the crime scene, and took several plaster casts of footwear impressions just outside the Aguirre residence. *See* Ex. 10 at 1-3 (Apr. 27 Rexer Report).[6]

33.    After Gonzales' arrest, OPD investigators sought testing of various items of evidence for the presence of DNA. *See* May 20, 1994 DPS Physical Evidence Submission Form

---

[6] However, many more prints were taken. On February 18, 2022, Mr. Gonzales received 136 newly discovered latent print cards and photographs of these pieces of evidence, which he is reviewing for potentially exculpatory information. *See* Statement of Facts, Part V.K *infra*.

(Exhibit 28) (submitting over 50 items for possible DNA analysis); *see also* Sept. 25, 2000 DPS

Physical Evidence Submission Form (Exhibit 29) (submitting 30 items for DNA comparison

with suspects). Some of these items of evidence had blood stains; others had human hair.

34.     None of this testing inculpated Gonzales or placed him at the crime scene.

35.     A January 13, 1995 DPS preliminary report explained the results of initial blood

type testing and indicated that "[i]tems which were found to contain human blood were

submitted to the DNA Lab for PCR testing" and that a report would be made available. *See* Ex.

15. However, OPD and DPS records produced to counsel for Mr. Gonzales in connection with

the 1995 trial contain no record of any reported DNA results.

## II.     GONZALES IS TRIED AS THE SOLE PERPETRATOR.

36.     The State indicted and tried Michael Gonzales on the theory he was solely

responsible for the murder of his neighbors Manuel and Merced Aguirre on April 21, 1994. 1

CR-T 1-2 (Indictment). The State, however, expected Gonzales' defense to involve the

admittedly complicit Perkins. It opened its case by telling the jurors, "If during the course of this

evidence it should become evident to you that others took part, that's fine. Remember, one

person at a time is tried. I will deal with the others." 15 RR-T 12. Despite that assurance, the

State charged no other suspect for the Aguirres' deaths.

### A.     The State's only direct evidence of guilt was the misleading testimony about a supposed, ambiguous confession to a jailer.

37.     The State's evidence against Gonzales rested on a dubious, fleeting confession to

a jailer and on several pieces of circumstantial evidence. *See Gonzales v. State*, No. AP-72,317,

at *2–5 (Tex. Crim. App. 1998).

38.     **The alleged "confession."** Charles Kenimer, Jr., a former contractor at the Ector

County Jail, where Gonzales was housed, testified that Gonzales confessed to the murders

shortly after he was arrested for the offense. 16 RR-T 310. Kenimer testified he saw Gonzales emerge "pretty upset" from an interrogation room with Robertson and a Texas Ranger on the date of his arrest. 16 RR-T 309, 311. Kenimer claimed that Gonzales told him in Spanish, "They're trying to pin this rap on me, this murder rap on me. They can't do it. They don't have any evidence. Although I did it, you know, but they don't have anything to go on." 16 RR-T 309. At trial, Kenimer conceded that the meaning of a Spanish phrase could have been lost in translation. 16 RR-T 311.

39.     But the supposed interrogation that, the testimony suggested, flustered Gonzales and led to the confession did not occur on May 7; it occurred *five days later*, on May 12. The prosecutor did not correct that discrepancy.

40.     More conflicts between the records and Kenimer's trial testimony were highlighted through Kenimer's testimony in a 2001 evidentiary hearing in Gonzales' federal habeas corpus proceeding. His trial testimony indicated that he initiated the conversation with Gonzales, but OPD records indicated Gonzales initiated the conversation. *See* Federal Habeas Testimony of Charles Kenimer at *363 (Exhibit 30). OPD records indicated Gonzales confessed because he knew he was related to Kenimer, but Kenimer testified in the federal proceeding that was not true. *Id*. at *375-76, *378. In the federal hearing Kenimer reiterated—incorrectly—that the interview of Gonzales by Robertson and the Texas Ranger was the precipitating event for Gonzales' confession. At the conclusion of Kenimer's testimony, the federal judge observed, "[T]he testimony of Mr. Kenimer [sic] is hopelessly confused. We could go back over this for I think hours and not get anything straight. I mean he is testifying in every direction." *Id*. at *404.

41.     **Circumstantial evidence.** Lead investigator Detective Robertson testified about several pieces of circumstantial evidence, much of which did not distinguish Gonzales from

other suspects. He testified there were "blood transfer stains" on a camper parked in the alley between the Gonzales and Aguirre homes. 15 RR-T 155. Robertson stated that he himself identified the stains as blood, "from a photograph that was taken," although he was unaware if the stains were ever analyzed. *Id*.[7]

42.     Detective Robertson testified about the meaning of two teardrop tattoos on Gonzales' face. Robertson said, "The sign of teardrops means the number of people that an individual has killed." 15 RR-T 139. The prosecution used this evidence to powerful effect in closing argument:

> [G]angsters in their own way have their symbols and they wear them proudly. Two teardrops. What does that mean? That means he has killed two people. And the symbol is there for those of his kind to see and appreciate. He doesn't try to hide it. It is as much as leaping out and saying to you, 'I did it, but they will never prove it.'

17 RR-T 387. Later, at Gonzales' 2001 federal habeas hearing, Robertson admitted his teardrop tattoo testimony was incorrect.[8]

43.     Detective Robertson also testified about the discovery of the small, red chile peppers under Merced Aguirre's body. Robertson testified that he found the same peppers "right next to [Gonzales'] back door," and "crushed" in a bowl in Gonzales' house. 15 RR-T 115. Robertson testified that the peppers "were somewhat unique." *Id*. at 121. He tried "numerous locations" to find similar peppers and talked to people "in those establishments [to] help me to

---

[7] The State introduced no evidence that the stains were collected or analyzed, and none has been produced to Gonzales. *See* OPD Property Invoice Log (Ex. 27); May 20, 1994 DPS Lab Submission Form (Ex. 28).

[8] *See Gonzales v. Quarterman*, 458 F.3d 384, 394 (5th Cir. 2006) ("[a]t the federal evidentiary hearing, Robertson testified that, before trial, he did not talk to Gonzales' counsel about the teardrop tattoos. He testified that, if they had asked him about the tattoos, he would have researched the topic more thoroughly and would have discovered that the tattoos had alternative, innocent meanings").

locate peppers like that," but could not "locate them." *Id*. On cross-examination, Robertson testified that he consulted with a pepper expert, Dr. Ben Villalon, at Texas A&M, about the peppers. *Id*. at 140-41. Dr. Villalon purportedly told him the peppers are "very, very rare for this area" and are grown primarily in Mexico. *Id*. at 140. Robertson claimed he was "mainly…basing my testimony on what Dr. Ben Villalon from Texas A&M Research Center in Weslaco, Texas, advised me of." *Id*. at 141.

44.     An OPD bloodstain pattern analyst, Sgt. Rick Pippins, testified that he believed Mr. Aguirre was attacked before Mrs. Aguirre because it appeared that Mr. Aguirre "was overcome quite … quickly," while Mrs. Aguirre "put up a greater struggle." 15 RR-T 200-01. In closing argument, the prosecutor turned Pippins testimony about the order in which the Aguirres were killed into "evidence" that one person killed both the Aguirres. Thus, the prosecutor argued:

> Mrs. Aguirre was obviously somewhere else in the house, in the kitchen, in one of the back rooms. I would say that probably she heard a commotion. Mr. Aguirre had to have at least made some sound. She responded to that sound and she was very brutally murdered. And she fought. You can tell, you can listen to the testimony. She fought.
>
> Mr. Pippins, he comes out, he is the blood spatter expert, and he tells you basically just exactly that, that that is what happened, that it was a very swift and very sudden attack and that it was probably by one person.

17 RR-T 362-63.

45.     Additional testimony about property stolen from the Aguirres' home filled out the case against Gonzales. Linda and Julian Olivarez testified that about a week after the Aguirres' deaths, Gonzales sold items—a VCR, microwave, and stereo—to them identified as having been stolen from the Aguirres' house. 16 RR-T 223-26, 233-34. Gonzales later retrieved the stereo from Olivarez when Olivarez did not pay for it. *Id*. at 237. Robertson testified the microwave and VCR purportedly belonging to the Aguirres were recovered from Olivarez. 15 RR-T 111-12.

14

Another detective testified that he retrieved the stereo from Lugo, who told him he had bought it from Gonzales. 16 RR-T 275. A fingerprint technician noted that latent print comparison identified three of Gonzales' fingerprints on the back of the stereo cabinet. 16 RR-T 282-84.

46.     Unobjected-to hearsay testimony reported that Gonzales had sold a handgun from the Aguirre house to a woman named Delia Sanchez. 15 RR-T 69. A firearms toolmark examiner from the DPS Crime Lab testified that shell casings found in Gonzales' home matched this gun. 16 RR-T 269. A police officer testified a potential witness, Rito Suniga, told him Gonzales had shown Suniga a weapon like the one in evidence, but that Gonzales told Suniga he had not killed the Aguirres. 15 RR-T 90-91.

47.     Dr. Sparks Veasey, a forensic pathologist who performed autopsies on the bodies of both victims, did not opine on a murder weapon and could not even say whether the Aguirres were stabbed with the same knife. 16 RR-T 314-19, 327-28, 346-48.

48.     When the State rested its case, defense counsel presented no evidence.

**B.     The State concedes others were likely involved.**

49.     Detective Robertson, the lead investigator on the case, testified he believed Daniel Lugo and Jesse Perkins were involved in the killings. 15 RR-T 143-44. He also testified that Jesse Perkins was a suspect. He said that police had conducted an "extensive" investigation into Perkins that remained ongoing. *Id.*

50.     Det. Robertson testified that many items from Gonzales' residence were sent to the Texas Department of Public Safety (DPS) Crime Laboratory in Austin, Texas, 15 RR-T 162-63, but most tested items returned inconclusive. *Id.* at 172.

**C.     The jury was instructed that, to convict Gonzales, it had to find he murdered both victims.**

51.     The State requested that the jury be instructed only on the theory that Michael Gonzales alone committed both murders. The instructions presented to the jury did not contain instructions permitting them to find Gonzales guilty under a law-of-parties theory of liability. *See* 1 CR-T 139-47.

52.     The Court of Criminal Appeals explained the significance in its opinion on direct appeal. Gonzales was charged with "murdering more than one person during the same criminal transaction," and "[n]o parties charge was given in this case." *Gonzales v. State*, No. 72,317, slip op. at 2 & n.3. "Therefore, the jury had to find <u>appellant</u> murdered both victims." *Id.* (emphasis in original).[9]

53.     Even though it conceded that others were present and may have played a role in the offense, 15 RR-T 15; 17 RR-T 388, the State minimized the possible culpability of others by focusing on the prior conflicts that Gonzales had with the Aguirres, 17 RR-T 364, and on the fact that Gonzales' fingerprints were found on a stereo that had been recovered several weeks after the incident and known to have been in the hands of Lugo and Olivarez as well. *Id.*

54.     During deliberations, it was evident that the jury struggled with the question of other perpetrators. One note asked the judge: "We need clarification on requirement of capital vs. murder verdict. If Mr. Gonzales murdered one individual only, does [h]is 'association' make him

---

[9]A person may be held criminally responsible for the conduct of another under certain circumstances. *See generally* Tex. Penal Code § 7.02. Thus, under a parties theory, a person may be found guilty of capital murder even if the person did not in fact cause the death of the complainant. Absent a parties instruction, however, a jury must find that the defendant himself caused the death. *See Prystash v. State*, 3 S.W.3d 522, 540 (Tex. Crim. App. 1999) ("If a defendant were convicted as the primary actor, he would have necessarily caused the death of the deceased. However, if the accused were convicted under a parties liability theory, then the possibility is raised that the accused did not actually cause the deceased's death.").

guilty of both." Jury Deliberation Note Requesting Clarification (Exhibit 31). The jury was not given any additional instruction.

55.     The jury returned a conviction for capital murder and, following a sentencing phase, answered the special issues resulting in a punishment of death.

## III.    IN 2000, EXCULPATORY DNA EVIDENCE IS FOUND.

### A.    DNA testing in 2000 excludes Gonzales from every interpretable piece of evidence.

56.     In 2000, the Odessa Police Department reopened its investigation of the Aguirre murders. At that time, police re-interviewed witnesses and submitted the evidence to the Texas Department of Public Safety crime laboratory in Austin, Texas, for DNA testing. OPD submitted blood standards from the victims and Gonzales, Lugo, and Perkins.

57.     Police requested that testing be performed on the following items:

- Item 5: Hairs and fibers from living room
- Item 13: Board from kitchen to living room threshold
- Item 15: Hairs and fibers from kitchen
- Item 16: Broken glass from kitchen of scene
- Item 17: Broken glass from kitchen
- Item 18: Blue house slipper from kitchen
- Item 19: Piece of tile from kitchen
- Item 23: Three pieces of board from utility room
- Item 24: Hair from utility room
- Item 39: Hair from N. W. bathroom in bathtub
- Item 42: Wall section from kitchen
- Item 47: Armchair cover from living room
- Item 49: Grey trousers with belt from Manuel Aguirre
- Item 50: White T-shirt from Manuel Aguirre
- Item 51: Blue jeans with brown belt from Jose Urias
- Item 52: T-shirt from Jose Urias
- Item 53: Shirt from Jose Urias
- Item 56: Pair of white socks
- Item 57: Pair of white shoes
- Item 58: Towel from storage shed (222 W. Schell)
- Item 59: Body bag from Merced Aguirre
- Item 62: Housecoat from Merced Aguirre

17

- Item 67: Hair from left foot of Merced Aguirre
- Item 76: Latent shoe impression from utility room
- Item 89: Grey pants from 517 S. Sam Houston (Perkins' home)
- Item 91: Hair from Item 89
- Item 94: Brown shorts from Michael Gonzales
- Item 95: Blue tank top
- Item 99: Blue jeans from 218 W. Schell
- Item 121: Multi-colored flannel shirt from 517 S. Sam Houston.

Ex. 29 (2000 DPS Evidence Submission Form).

58.     Of those, the DPS identified the presumptive presence of blood on Items 47, 49, 50, 62, 89, and 121, and extracted DNA from Items 13, 16, 17, 18, 19, 23, 25, 42, 44A, 44B, 47, 49, 50, 51, 52, 53, 58, 61, 62, 63, 72, 73, 76, 89, and 121. The DPS analyzed none of the hair and fiber evidence (5, 15, 24, 39, 67, 91).

59.     The DPS lab performed testing in 2000[10] using the available polymerase chain reaction (PCR) technology, which examined short tandem repeats (STR) at 9 loci. *See* October 17, 2003 DPS Laboratory Report at 2 (Exhibit 32). The DPS report identified Mrs. Aguirre's profile as consistent with the single-source profile in several blood stains on the flannel shirt taken from Jesse Perkins' closet. *Id*. Significantly, Mr. Aguirre was the source of yet another stain taken from the shirt. From the DPS lab notes on Item 121, it is apparent that analysts did not examine the inside of the shirt. *Id. See* Ex. 3 ¶¶ 11-26 (Third Sutton Aff.) (scrutinizing DPS examination of shirt), ¶ 34 ("There is no indication that the interior of the flannel shirt was ever examined by the DPS laboratory for the presence of biological stains.").

---

[10] The results were not reported until 2003.

60.     No crime-scene evidence with interpretable DNA had Mr. Gonzales' profile. *Id.*[11]

DPS retained "the remaining cuttings and DNA extracts" in a freezer in the laboratory. *Id.* at 4.

61.     Although the testing and interpretation was performed in 2000, and a draft report

was prepared at that time, the testing results were not reported to OPD until October 17, 2003.

Ex. 32.

62.     The State in turn waited five years to disclose the report to Gonzales, only turning

it over in 2008 when a court ordered the State to provide the information in pre-trial discovery

before Gonzales' resentencing proceeding. 3 CR-R 644-50 (motion requesting lab reports); 7

RR-R (granting discovery).

## IV.     GONZALES' EFFORTS TO ASSERT HIS INNOCENCE AT HIS 2009 RESENTENCING TRIAL ARE REJECTED.

63.     In 2009, Gonzales returned to state court for a resentencing trial. Gonzales'

lawyers attempted to challenge the weak case of guilt, but the trial court denied their motion to

do so. 2 CR-R 263-325 (motion to introduce residual doubt evidence); 3 CR-R 612-616

(supplemental motion); 6 RR-R 7 (overruling motions at August 2008 pretrial hearing); 5 CR-R

1002-1010 (second supplemental motion to challenge evidence of guilt based on State's

disclosure of 2000 reinvestigation); 27 RR-R 4-5 (overruling second supplemental motion).

64.     In the resentencing trial, Gonzales' wife, Martha Reyes, testified for the first time

about events relevant to Gonzales' culpability. At the time of the murders, Reyes lived with him

and his mother at the Gonzales home. Reyes testified that, to get money for a birthday party and

presents for their daughter, Gonzales asked her to get the Aguirres to open the door for him. 27

---

[11] The DPS report noted that several items of clothing collected from Michael
Gonzales—including his shorts, tank top, and blue jeans (Items 94, 95, and 99)—had "no stains
of evidentiary value."

RR-R 61. Gonzales told her that once inside he was going to "[j]ust push around, you know, get a VCR so he knew he could sell it, pawn it." *Id*. at 62. Reyes did go over to the Aguirres' house "about 9:00," was allowed inside, *id*., and talked to the Aguirres until about 10:00 pm. *Id*. at 64. She knew this because it was close to when the local news was coming on the television. *Id*.

65.     As Reyes was leaving, she kept talking to Mrs. Aguirre, who was standing near the doorway. *Id*. at 64-65. Reyes stood outside talking to her for a few minutes. *Id*. at 65. Reyes saw Gonzales come around the corner. *Id*. She saw no weapons or anyone else with him. *Id*. at 66, 69. Reyes then went into her house until Gonzales returned "shortly thereafter." *Id*. at 65, 66. Reyes testified that Gonzales had blood on his clothes. *Id*. at 66. When she asked what happened, Gonzales said, "There was an accident." *Id*. She saw that Gonzales had a knife, which he washed and put back in the drawer. *Id*. at 67. She knew that Gonzales had stolen a VCR, but that was the only item she saw. *Id*.

66.     On cross-examination, Reyes testified that a statement she gave to Odessa police on May 7, 1994—that she went to bed about 11:30 p.m. and learned that something had happened when she woke up at 10:00 a.m.—was false. *Id*. at 77-78. She also testified that when defense investigator Nancy Piette spoke to her on September 25, 2007, Reyes told her this same false story. *Id*. at 78-79. She testified further on cross-examination she saw nobody with Gonzales, but she did not know if anybody else was involved. *Id*. at 80. She told police somebody else probably could have helped Gonzales, and that it could have been Daniel Lugo. *Id*. at 79, 82. She did not actually see Gonzales enter the Aguirre house, and she did not know if anyone entered the house with him. *Id*. at 80-81. The decision to rob the Aguirres was a spontaneous idea that Gonzales had while he and Reyes were discussing a birthday for their daughter. *Id*. at 81.

67.     Cross-examination was abruptly interrupted by an outburst from Gonzales and never resumed. *Id*. at 83-86. Although not covered in cross-examination, Reyes told authorities that after his arrest Gonzales repeatedly told her, "I didn't do it." *See* Part V.J. *infra* (discussing 2000 Reyes interview).

68.     Det. Robertson also testified at resentencing that he believed Daniel Lugo was "connected to" the homicides, 27 RR-R 194, that Jesse Perkins had admitted he was in the house, *id*. at 192, and that Perkins was an "accomplice in these murders," although maybe only an accomplice after the fact, *id*. at 194-95.

## V.     POST-TRIAL EVIDENCE RELEVANT TO INNOCENCE CHANGES THE EVIDENTIARY PICTURE.

### A.     Jesse Perkins confesses to committing the murders and setting Gonzales up.

69.     Gonzales has now discovered evidence that Perkins confessed to two people at separate times that he murdered Mrs. Aguirre, and someone else—not Gonzales—murdered Mr. Aguirre.

70.     Within a few days of the Aguirres' murders, Eduardo Saenz Nino, a longtime friend of Gonzales, tried to find Gonzales at his home. Ex. 1 (Affidavit of Eduardo Nino). Nino had been in jail in Lubbock and had just returned to Odessa. *Id*. ¶ 2. When he could not find Gonzales, Nino went to a close friend of theirs, Adonica Means (now Nunez), to see if she knew where Gonzales was. *Id*. ¶ 3. She told him that Gonzales' neighbors, the Aguirres, had just been murdered but she did not know where Gonzales was. *Id*. Concerned, Nino went to see another friend, Julian Olivarez, to discover what was going on. *Id*.

71.     Jesse Perkins was with Olivarez, and they began talking. *Id*. ¶ 4. Then,

Jesse told me that he and Julian and Daniel Lugo broke into the Aguirres' house to look for guns. Jesse told me that when they got into the house, he (Jesse) attacked the old lady first, and when the old man tried to defend her, he got

21

stabbed. Jesse said that they took the older lady to the restroom and then brought her back to the area where she was stabbed (by Jesse).

72.    *Id*. Asked about why Perkins would confess to him, Nino averred that Perkins "always loved to brag about what he has done or is going to do." Telling Nino about the murders "is just the kind of person he is." *Id*. ¶ 5.

73.    Nino recalled two other matters from this visit. He noticed "Jesse had a cloth wrapped around the palm of his left hand up to his wrist." *Id*. ¶ 6. Perkins explained, "[H]e got cut inside the Aguirres' house and got blood all over his shirt. *Id.* He said, "'Spider' [the nickname Gonzales went by] gave him the flannel shirt he (Jesse) was wearing." *Id*. Perkins also told Nino "they were going to give 'Spider' a pistol they took from the Aguirres' house to set him up." *Id*. ¶ 7.

74.    Nino did not come forward earlier because, at the time, he "was too concerned about my own problems" to do anything with what he learned *Id*. ¶ 8. Two months after Perkins' confession, he was arrested again and ended up in state prison for several years and in federal prison for years thereafter. *Id*. He happened to be at another witness' house in August 2021 when he overhead Gonzales' investigator talking to that person about Gonzales. *Id*. This conversation "jarred" Nino's memory, and he mentioned to the investigator what he recalled about Perkins' confession. *Id*.

**B.    Jesse Perkins admits he bled in the Aguirre house, and other evidence supports that admission.**

75.    Perkins recently made a new admission consistent with the story he recounted to Eduardo Nino. On October 12-13, 2021, a defense team investigator, Richard Reyna, interviewed Perkins while he was in custody at TDCJ's Rudd Unit. During the interview, Reyna told Perkins that he believed DNA testing showed blood found at the crime scene did not match the DNA of the murder victims or of Gonzales. Ex. 2 (Affidavit of Richard Reyna). "Perkins

responded spontaneously, 'That blood is probably mine.'" *Id*. Perkins refused to answer any follow-up questions or sign an affidavit to this effect. *Id*. Perkins' admission about bleeding in the Aguirres' house finds support in other evidence.

76.     Defense bloodstain pattern analysis expert Paulette Sutton, an eminent, nationally, and internationally recognized expert in bloodstain pattern analysis has explained there is a likelihood that the perpetrator of a stabbing will sustain cuts during the attack:

> In a case with multiple stabbing injuries, there is a good probability that the perpetrator will be injured and bleeding. Common household cutlery does not have the hand guard that is found on assault or hunting knives. The sudden cessation caused by unexpectedly hitting a bone or other hard surface while stabbing someone can cause the perpetrator's hand to slide down onto the blade and be cut. Injury may also result simply because their hand or the handle of the knife has become bloody and slippery and slides down onto the blade. During the struggle, assailants may actually stab themselves.

First Affidavit of Paulette Sutton, January 31, 2022 ¶ 58 (Exhibit 33).

77.     Perkins had at least one cut on his left wrist. Det. Robertson first interviewed Perkins on May 5, 1994. Report of Det. Robertson, October 14, 1994 (Exhibit 34). In his October 14, 1994 report, he recalled, "that Jesse Perkins had a small cut on his left wrist when I first interviewed him." *Id*. This cut and a cut on his left arm were photographed when Robertson interviewed Perkins on December 6, 1994, Report of Det. Robertson, December 6, 1994 (Exhibit 35), over seven months after the murders and after the cuts had become scars. *See* Ex. 26 (Photographs of Perkins' scars). When Robertson asked Perkins how he got these cuts, Perkins said that he suffered the large cut in an earlier burglary for which he was on probation and one from "metal sheet blinds" covering windows at his work at a car wash. *See* Ex. 20 at 29-31 (Dec. 6, 1994 interview).

78.     But the record indicates that Perkins was lying. On September 2, 1993, Perkins was booked and then released on bond at the Ector County jail for burglary of a building. *See*

23

Exs. 24 & 25 (Perkins' September 1993 and May 1994 Ector County Jail booking cards). At that time, the sheriff's deputies noted no distinguishing scars on Perkins' lower arms—only a scar or scars on his *upper right* arm. There is no indication in the record that Robertson ever attempted to confirm Perkins' story about being wounded at work. Blinds could not have caused the large gash visible on Perkins' left arm. Even if Robertson had confirmed Perkins' dubious report about the injury at the car wash, it is possible that Perkins would have made a false report of a work injury to conceal the true cause of his wound—self-injury during a stabbing.

79.     Perkins' statement to Nino that he got cut when he was inside the Aguirres' house is also consistent with the report of the Odessa Police Department's bloodstain pattern expert, Sgt. Rick Pippins. In his December 8, 1994 report (Ex. 9), Sgt. Pippins noted the following:

> There is evidence of dropped bloodstain on the lower front portion of Mrs. Aguirre's blouse. This bloodstain appears to be circular and in the 5mm to 9mm range. This staining was most likely placed on the blouse after Mrs. Aguirre was in the supine position she was found. *It is possible then that the attacker dropped the blood from his person while standing or kneeling over Mrs. Aguirre.*

Ex. 9 at 14 ¶ 6 (emphasis supplied). Sgt. Pippins also found drops of blood on the laundry room floor "indicative of a blood source creating drops falling several feet down to the surface such as a standing man." *Id*. at 17.

80.     It is important to note that the source of the blood drops that Pippins identifies as from the "person" of the perpetrator is most likely from a perpetrator who was himself bleeding from an injury, not from a bloody weapon or the victim's blood on him from the attack. As Ms. Sutton explains, "Contrary to widely held belief, multiple drops of blood rarely originate from a bloodied perpetrator or from a bloody weapon. Due to the effects of surface tension, multiple drops indicate that the source is, instead, an actively bleeding individual." Second Affidavit of Bloodstain Pattern Analyst Paulette Sutton, February 12, 2022 ¶ 16 (Exhibit 41) (citing James, Kish & Sutton, *Principles of Bloodstain Analysis* 80 (1st ed. 2005 CRC Press)).

81.     By contrast, Gonzales had no cuts when the police checked him the day after the murders. The police tested Gonzales' arms and hands with luminol on April 22, and there was no indication of any cuts or detectable blood. 20 RR-T 29, 31-33 (testimony of Brett Lambert).

82.      Perkins is thus the only person other than the Aguirres who, based on evidence known thus far, bled in the house. And this was because of cuts he sustained when, by his own admission, he attacked the Aguirres. Based upon the facts now known, he is the only person who Sgt. Pippins could have described as "the attacker [who] dropped blood from his person while standing or kneeling over Mrs. Aguirre." Ex. 9 at 14 ¶ 6. In addition, he is the only known person who could have been the "standing man" who left drops of blood in the laundry room.[12]

83.     Perkins' admission he was the assailant who stabbed Mrs. Aguirre was also confirmed by the statement he made to Eduardo Nino. Nino Affidavit ¶ 4. Thus, there are multiple indications that Perkins was the person likely to have had blood dripping from his wounds on Mrs. Aguirre's clothing.

**C.     The attack apparently took place in part in the bathroom.**

84.     Nino recounts that Perkins said he attacked Mrs. Aguirre first, but the attack was interrupted by Mr. Aguirre, and after Mr. Aguirre was stabbed, "they took [Mrs. Aguirre] to the

---

[12]No DNA testing was conducted of the blood drops on Mrs. Aguirre's clothing or of the blood drops from the laundry room floor identified by Sgt. Pippins as likely coming from the perpetrator. The "tiling from the utility room" (Item 25) was submitted in 1994 for DNA testing, but a confirmatory test indicated no blood present. Ex. 15. The OPD did not re-submit the item for testing in 2000. *See* Ex. 29. While blood stains on Mrs. Aguirre's clothing were tested, the stains tested were not those described by Sgt. Pippins as "on the lower front portion of Mrs. Aguirre's blouse." Pippins Report. *See* DPS Crime Laboratory Files About Merced Aguirre's Housecoat and Gown (Exhibit 37) (showing that the DNA testing of Mrs. Aguirre's clothing did not include the drops on the "lower front portion of Mrs. Aguirre's blouse").

restroom and then brought her back to the area where she was stabbed (by Jesse)." Nino Affidavit ¶ 4.

85.     The crime scene investigation is consistent with the detail of Mrs. Aguirre being in the bathroom during the attack. On the night of April 22, the police conducted luminol testing in the Aguirres' house, including "the northwest bathroom area." OPD Report on April 23 Luminol Testing at 3 (Exhibit 36). "Some areas luminesced, along the tub and the sink area mainly." *Id*. Thus, there was blood in the bathroom. The police bloodstain pattern expert, Rick Pippins, testified that Mr. Aguirre offered little resistance and was likely killed where he was sitting when the attack commenced. 15 RR-T 200-01. Thus, if the blood in the bathroom came from one of the Aguirres, it likely came from Mrs. Aguirre. From Perkins' account to Nino, it appears that the attack had already begun against Mrs. Aguirre before she was taken or made her way to the bathroom, and she bled in the bathroom from wounds inflicted there or already inflicted. Thus, the presence of blood in the bathroom confirms this part of Perkins' account. No DNA testing of the blood in the bathroom was undertaken.

**D.     The flannel shirt found in Perkins' closet with the Aguirres' blood on it connects Perkins, not Gonzales, to the murders.**

86.     Perkins told Nino that Gonzales gave him a flannel shirt after the murders, because he "got blood all over his shirt" during the murders. Nino Affidavit ¶ 6. On May 11, 1994, approximately two weeks after Perkins confessed to Nino, officers found the flannel shirt marked Item 121 in Perkins' house. Ex. 23 (Robertson report on search of Perkins' residence) The DPS lab reported in 2003 that DNA testing identified blood stains from both the Aguirres on the shirt. Ex. 32 at 2.

87.     Police investigation appeared to establish that Gonzales was wearing the flannel shirt after the murders when he and Perkins were picked up by a friend of theirs named Ruby

Luna around 10:30 pm the night of the murders, Witness Statement of Ruby Garza Luna, OPD Narrative, May 13, 1994 at 1 (Exhibit 38), and Gonzales then gave it to Perkins. *Id*.[13] In opposing DNA testing, the State has argued that these facts mean Gonzales was wearing the flannel shirt, later found in Perkins' closet, during the murders. That has now been disproven.

88.     Ruby Luna recently provided a declaration in which she said that the statement the police took from her was inaccurate with respect to a flannel shirt. Declaration of Ruby Luna, February 11, 2022 (Exhibit 40). She stated she "did not tell Det. Robertson" that Gonzales was wearing a flannel shirt when she picked Perkins and then Gonzales up after 10:30 pm on the night of the murders. *Id*. ¶ 10. She states unequivocally, "Michael was not wearing a flannel shirt." "The only person wearing a flannel shirt that night was Jesse Perkins." *Id*. She explains that when she "saw [Perkins] walking that night and offered to give him a ride, I noticed that he had a shirt that covered his arms. After he got in my truck, I saw it was a flannel shirt." *Id*. She "remember[s] thinking that the shirt looked very big on him and that the sleeves to the shirt were pretty long and practically covered his hands." *Id*.[14]

---

[13]Based on the Aguirres' nightly routine, investigators established that the murders occurred sometime between 8:00 pm and 10:30 pm on April 21, 1994. Det. Robertson Report on Estimate of Time of Death at *19 (Exhibit 39).

[14]Ms. Luna explains that "[t]hese false statements were in the document because Sgt. Robertson put them there." *Id*. ¶ 14. She did not correct them because she did not read the document. This is what happened:

> After my interview with him, Sgt. Robertson gave me a typed witness statement and told me that everything that we talked about was included in the statement. He then put the statement in front of me and told me to put my initials before and after each paragraph and to put my initials by the changes he made in his handwriting, and then sign it. I did what he told me to do.

> At the end of my statement, I said that I read both pages of my statement. This is not true. The truth is that I never read the statement nor was it ever read to me. I was just told to sign it by Sgt. Robertson which I did because I was frightened, and I just wanted to leave.

89.     Thus, the evidence now shows that Perkins had the flannel shirt sometime before he was picked up by Ruby Luna at 10:30 pm the night of the murders. His statement to Nino that Gonzales gave him the shirt because the one he was wearing in the Aguirres' house "got blood all over [it]" indicates that Gonzales gave him the flannel shirt after the murders. But this occurred before Ruby Luna gave him and Perkins a ride, and he (Perkins) transferred blood from his person/bloody shirt to the flannel.

90.     Bloodstain pattern expert Paulette Sutton provides further corroboration. Ms. Sutton has examined the DPS sketches showing the relative amount and placement of the bloodstains on the flannel shirt to determine whether the shirt could have been worn during the attack on the Aguirres, as the State has argued. Ms. Sutton has concluded that the stains do not support the State's argument that the shirt was worn during the attack on the Aguirres. Exhibit 41 (2d Sutton Aff., 2-12-22). She explains, first, "[t[he distribution of the bloodstains on this flannel shirt is indicative of the shirt being worn during incidental contact with exposed blood belonging to Mr. and Mrs. Aguirre." *Id*. ¶ 14. Second, "[t]he distribution of the bloodstain pattern on this flannel shirt is not indicative of the distribution that would be created during this violent assault." *Id*. ¶ 15.

> There are bloodstain patterns [in the house] that indicate Mrs. Aguirre put forth a considerable struggle with her attacker(s). Such an interaction would be likely to result in a more widespread distribution of stains on a perpetrator's garment than is indicated by the laboratory sketches.

*Id*. The "incidental contact" with the Aguirres' blood on the flannel shirt is thus consistent with the contact Perkins had with the shirt when, bloody from the attack, he got the shirt from Gonzales and put it on.

---

*Id*. ¶¶ 14, 15.

91.     Recently available evidence provided even more confirmation of this. On February 14, 2022, crime scene technicians with the OPD photographed both the outside and inside of the flannel shirt at the request of Gonzales' counsel. Affidavit of CSU Supervisor Stephanie Bothwell, February 22, 2022 ¶¶ 6, 7, 9 (Exhibit 42). The photographs were then examined by bloodstain pattern analyst Paulette Sutton. Ex. 3 (3d Sutton Aff., Feb. 25, 2022). Her previous opinion that the bloodstains on the outside of the shirt came from "incidental contact with exposed blood belonging to Mr. and Mrs. Aguirre and not during a violent attack," "was reinforced by the photographs of the flannel shirt." *Id*. at 8.

92.     Moreover, never-before-taken photographs of the inside of the shirt reveal staining on the inner lining. *See* OPD Photographs of Flannel Shirt, February 14, 2022 (Exhibit 43).[15] As seen in the photos, the staining is visible on both sleeves. The location of these stains on the interior lining does not correspond to the location of the known stains on the exterior of the shirt.

93.     *See* Figure 1 below.[16]

---

[15]Due to the size of these files, Gonzales will deliver a disc drive of Exhibit 43 and 44 contemporaneous with filing and serve another copy on Defendants.

[16] The rest of the photographs are available as Exhibits 43 and 44.



Figure 1. OPD Photograph of Inner Lining of Item 121 with areas of discoloration circled.

OPD even agreed to examine the inside of the shirt under alternate light source

visualization to enhance stains. Bothwell Affidavit ¶ 9. This revealed several more stains not

visible in ordinary light to the naked eye. *See* OPD Photographs of Flannel Shirt Under Alternate

Light Source, February 22, 2022 (Exhibit 44). *See* Figure 2 and 3 below.



Figure 2. OPD Photograph of Inner Lining of Sleeve (Left Arm) of Item 121 using ALS.



Figure 3. OPD Photograph of Inner Lining of Sleeve (Right Arm) of Item 121 using ALS.

94.     According to Paulette Sutton, some of the staining appears to be blood. "In my experience, I have found that bloodstains deposited on black synthetic material, such as the quilted interior of the flannel shirt, often present as a brownish stain." Affidavit of Paulette Sutton at 8.[17] Further, the location of the stains "on the interior surface of the flannel shirt (Item 121) … is consistent with their being deposited by a person with an injured arm and/or hand wearing the shirt." *Id*. And, these stains are also "consistent with blood on the interior of the sleeve in the same location that Nino says Jesses Perkins was injured." *Id*. at 10. Finally, these findings are consistent with the wounds to Perkins' hands that the Ector County jail noted, and Det. Robertson saw and photographed.

95.     These stains on the inner left sleeve of the flannel shirt also connect the blood stains on the lower left leg of Perkins' pants to the cuts on his left arm. As Sutton observes, "Blood dripping from an injured arm/hand as described by Nino in his affidavit dated February 02, 2022 is certainly consistent with the location of the stains found on the outer legs of the pants." *Id*. at 9.

### E.     Perkins and Olivarez gave Gonzales the property they stole from the Aguirres to set up Gonzales.

96.     Perkins told Nino that "they were going to give 'Spider' a pistol they took from the Aguirres' house to set him up." Nino Affidavit ¶ 7. This statement, too, has corroboration in the record of the police investigation and newly discovered evidence.

---

[17] DNA expert Huma Nasir agrees: After reviewing the photographs of the shirt that had been made with an alternative light source, she found, "[t]here are several areas on the inside lining of the shirt including the sleeve that fluoresced under the alternate light source suggesting possible presence of bodily fluids[,] … [s]ome of [which] may be from bloodstains since it is not uncommon for a perpetrator to stab themselves in the process of stabbing a victim." Affidavit of Huma Nasir, February 25, 2022 at 2 (Exhibit 45). (Ms. Nasir previously submitted two affidavits with Gonzales' Chapter 64 filings.)

97.     Initially, the police investigation appeared to establish that Gonzales had the items taken from the Aguirres' house immediately after the murders. Julian Olivarez told the police in a statement on May 6, 1994, that on April 22, 1994, the day after the murders, Gonzales "told me [and my wife] to go by his house, that he had some things that he wanted me to look at to see if we wanted to buy any." Ex. 12. In a closet in his room, Gonzales showed them "a microwave, VCR, and stereo, and some speakers inside a crib," a camera "[u]nder a pillow," and underneath a dresser "a silver pistol with white handles … a revolver … a .22." *Id.* All these items were identified as having been taken from the Aguirres' house. Ex. 8.

98.     No one other than Olivarez and his wife claimed to have seen all these items in Gonzales' possession shortly after the murders. Two witnesses said they had each seen one item in his possession the night of the murders. Ruby Luna told the police that Gonzales showed her the pistol when she stopped to give him a ride the night of the murders. Ex. 38 (1994 Luna statement). Martha Reyes, Gonzales' wife, testified at the 2009 resentencing trial she saw he had stolen a VCR from the Aguirres' house the night of the murders. 27 RR-R 67.

99.     All these statements are thrown into question by a police interview with Gonzales' mother, Epigmenia (Pim) Gonzales, as part of their re-investigation in 2000. In that interview, Det. Sgt. Larry Bartlett said to Ms. Gonzales, "It looked like the most damning thing on [your son] was the … having their property over in his bedroom, you know, in your house, that time." Interview of Epigmenia Gonzales, May 31, 2000 at 18 (Exhibit 46).

100.    The colloquy that followed indicated that the property was not there the night of the murders and that it showed up only a week later after Julian Olivarez brought it there:

PG      [Pim Gonzales]: … somebody said that it wasn't here and then, all of a sudden, it came from Julian to here….

PG:     … I know there was nothing here. And then, all of a sudden, you know, it--it was here….

LB [Larry Bartlett]: When did you first notice it there? ….

PG:     … maybe about a week after. Because I know it was not here….

LB:     It was not there … after the murder?

PG:     It was not here. And then, all of a sudden, it comes … it appears here….

LB:     … could it have been there and you not notice it? Did you go in their room often?

PG:     … I … sort of glanced in the room…. And, I didn't see anything, you know, and then, all of a sudden, you know, I glanced and something was covered….

LB:     And this was about a week later? ....

PG:     … yeah….

LB:      It wasn't here that Fri-Friday, when all the cops were out there working the scene, are you sure it wasn't there?

PG:     No, cause--because, uh, the door was open and they [Michael and Martha] were lyin' down in the bed…. [A]nd the room's not that big….

LB:     So, you think it's a possibility … it went from like Julian to Michael, for whatever reasons? ....

PG:     Uh-huh.

*Id.* at 18-20 (ellipses in original).

101.    Further doubt about whether Gonzales had the property from the Aguirres' house immediately after the crime is raised by the recent declaration of Ruby Garza Luna. As with the part of the police statement from her about who was wearing the flannel shirt the night of the crime, Ms. Luna stated in her declaration that the part of her police statement indicating that Gonzales showed her the gun that night is not true. 2022 Luna Decl. ¶ 9. "Michael did not show me, or anyone else while he was in my truck, a silver gun or any other type of gun." *Id*. ¶ 11.

102.    Finally, Martha Reyes' testimony at the resentencing trial about having seen Gonzales with the Aguirres' VCR the night of the murders, April 21, 1994, conflicts with the

statement she gave the police on May 7, 1994. Statement of Martha Gonzales, May 7, 1994

(Exhibit 47). She said nothing in her 1994 statement about seeing Gonzales with the Aguirres'

VCR the night of the murders. She did report seeing items consistent with the property stolen

from the Aguirres in her house two days later after some men apparently came to the door of her

and Michael's house:

> On Saturday, April 23, 1994, around 9 or 10 pm, I heard voices and Michaels
> [sic] voice at the front door of our home. It sounded like men's voices at the door.
> I do not know who was at the door. After bathing my daughter, I went into her
> room and I saw some things covered with a blanket or a towel. I could see some
> black stereo speakers sticking out slightly. I did not look at the things under the
> blanket and I did not ask Michael about them.

103.    *Id*.

104.    While the time frame differs from the time frame Gonzales' mother recalled, Ms.

Reyes' statement is consistent with Ms. Gonzales' in recounting that the property appeared some

days after the murders and, critically, that the appearance of the property in the Gonzales home

was associated with other men being there.[18]

105.    Taken together, the police interview with Gonzales' mother during their

reinvestigation, Exhibit 46, the declaration from Ruby Luna, Exhibit 40, and the May 7, 1994,

statement by Martha Reyes, Exhibit 47, support the statement by Perkins to Nino that "[we] were

going to give 'Spider' a pistol [we] took from the Aguirres' house to set him up." Nino Affidavit

¶ 7. The property showed up in Gonzales' room "from Julian [Olivarez] … a week after [the

murders]," Ex. 46 at 18 (Pim Gonzales 2000 interview), or two days later when some men came

to the front door of Gonzales' house, *see* Ex. 47 (Martha Reyes Gonzales statement).

---

[18]It is also telling that, while Ms. Reyes saw in the same place (her daughter's room) one
of the same things Julian Olivarez said he saw—"some speakers inside a crib," Statement of
Olivarez, she saw it more than a day later than he claimed to have seen it. That Ms. Reyes had
not seen it at the time Olivarez claimed he did thus calls Olivarez's statement into question.

**F.     Independent evidence confirms that Lugo and Olivarez were involved in the murders**

106.    The police investigation developed evidence that Lugo knew about the murders before the police did. At trial, Robertson testified that the ODP received information that Lugo had asked "a lady … if the police had been informed about the bodies next to Michael's house." 15 RR-T 125-26. Critically, "this was approximately an hour before the police were notified." *Id*. at 126. This testimony demonstrates there was independent evidence supporting Perkins' statement to both Nino and Nunez that Lugo participated in the murders along with Olivarez and him.

107.    On January 28, 2022, Rito Suniga provided an affidavit to Gonzales' investigator. Suniga recounts an incident that occurred two or three days after the murders. Affidavit of Rito Suniga (Exhibit 48). He was with Gonzales in Gonzales' front yard "when a car pulled up." *Id*. Olivarez and another man called "Diablo" got out of the car with guns. Olivarez pointed his gun at Gonzales and said, "'You better not say nothing, and you better keep your mouth shut.'" *Id*. Both men then got back in their car and drove off. *Id*.

108.    Suniga reported this incident to the Odessa police and recalled that Det. Robinson interviewed him. *Id*. Nothing, however, appeared in the police report about this.

109.    A few months later, a similar incident occurred, this time directed toward Suniga's wife. Daniel Lugo "went to where my wife worked and threatened her." *Id*. He said, "'You better keep your mouth shut,' and then left." *Id*.

110.    Lugo and Perkins apparently did not assert alibis for the time of the murder. The OPD file contains no indication that either claimed an alibi. By contrast, Olivarez did maintain an alibi. In his statement to the police, he stated that the day of the murders he "went to work at 8 am and got home about 11 pm." Statement of Olivarez. Police waited until June to ask his boss

whether Olivarez was in that night and received no confirmation. Report of Det. Robertson on Olivarez Alibi, June 8, 1994 (Exhibit 49).

G.   **Suppressed evidence disproves the uniqueness of the chile peppers**

111.   According to Detective Robertson, peppers expert Dr. Villalon purportedly told him the peppers are "very, very rare for this area" and are grown primarily in Mexico. 15 RR-R 140.

112.   New evidence shows that Dr. Villalon did not tell Robertson that the peppers were "very, very rare" for the Odessa area. In a file memo from the Ector County District Attorney's file, a staff member of the DA's office reported about a call she made to Dr. Villalon on November 30, 1995. Memorandum from Rebecca Sample to John W. Smith & Preston Stevens (Exhibit 50). Dr. Villalon told her only that Robertson had asked him to look at various peppers and tell him "if the peppers were the same." *Id*. Dr. Villalon said that "all he could say was that the peppers appeared to be the same to him." *Id*. He said nothing to Ms. Sample about whether the peppers were rare for the Odessa area. "[H]e didn't see how he would be useful in this case when he can only say that the peppers seem to be the same." *Id*. A handwritten note at the bottom of this memo states, "Snow [Robertson] said" that Villalon told him the peppers "were very rare for this area." That is not what Villalon told Ms. Sample that he told Robertson. Neither this memo nor the information in it was provided to Gonzales' counsel until 2020.

113.   Robertson thus likely lied, and gave false testimony, about what Dr. Villalon told him. Moreover, he ignored the innocent explanation for how the peppers appeared at Gonzales' back door and in the refrigerator in his house. Robertson interviewed Gonzales' mother, Epigmenia Gonzales, on May 5, 1995. Excerpt from May 5, 1995 Interview of Epigmenia Gonzales (Exhibit 51). He asked Mrs. Gonzales about the peppers, and she identified them as "chile piquin." *Id*. at *118. Mrs. Gonzales said she uses them to make "Menudo and then pizza

or whatever." *Id*. at *119. She also said, "you can crush [them]" or "buy crushed," but she "usually [bought] crush[ed]" ones. *Id*. at *120. When Robertson told Mrs. Gonzales he "found some of those red peppers right next to you backdoor," Mrs. Gonzales said if they fell on the floor, she would "sweep [them] out…" *Id*. at *139.

### H. Bloodstain pattern expert concludes that the bloodstain testimony and argument at trial were false and misleading.

114.    Bloodstain pattern expert Paulette Sutton has examined the testimony of Det. Robertson about, and the photographs of, the "blood transfer stains" that Det. Robertson identified on the camper between the Gonzales and Aguirre houses. Ex. 33 at 10-12 (First Sutton Aff., 1-31-22). Ms. Sutton observes, "There is no evidence to support that these stains are, in fact, blood," *id*. at 10, and doubts that they are: "These stains are lighter in coloration than whole blood and are not visually consistent with blood." *Id*. Ms. Sutton explains that "[i]n the absence of testing, it is impossible to determine that these stains are, in fact, blood." *Id*. Even though "[s]ampling of the stains and further testing is imperative in this situation," *id*., "[n]o samples of the stains on the camper were collected or analyzed even though 128 other samples were collected at the scene." *Id*. at 11.

115.    After explaining the standard practice that should have been undertaken to determine whether these stains were from blood, *id*., Ms. Sutton notes that Robertson was not qualified in the field of bloodstain pattern analysis. *Id*. She then concludes:

> Det. Sgt. Robertson should not have offered an opinion regarding the mechanism by which these stains were deposited. Det. Sgt. Robertson had no evidence that the stains were really blood and apparently no training to determine their mechanism of deposition.

*Id*.

116.    Because of these deficiencies in the investigation and in Robertson's testimony, Ms. Sutton states, "Sampling of the stains and further testing is imperative in this situation." *Id*.

at 10. That is no longer possible, because the camper is no longer on the property where the Gonzales' house stood, and to the extent records are available, it appears that the camper has been destroyed.

117.    Ms. Sutton also examined the other bloodstain pattern evidence presented in the 1995 trial by an OPD bloodstain pattern expert: Officer Rick Pippins' testimony that Mr. Aguirre was very likely attacked first because Mrs. Aguirre had more injuries and appeared to have struggled more than her husband. She notes, "Neither of these observations indicate any useful information about the number of attackers or the order of attacks." Jan. 31, 2022 First Sutton Affidavit at 13 (Ex. 33). Since Mr. Aguirre was very weak after heart surgery, "[i]t is [just as] plausible that the attacker or attackers would view Mrs. Aguirre as the greater threat and attacked her first because the more robust and greater threat would need to be eliminated first." *Id.*

118.    She also said that "[n]othing about the evidence eliminates the possibility that two or more attackers assaulted Mr. and Mrs. Aguirre." *Id.* She then laid out plausible scenarios:

> These attacks could have occurred roughly simultaneously. One attacker could be apt to carry out a frenzied attack such as the attack on Mrs. Aguirre and one might be more able to control the weakened Mr. Aguirre. Or perhaps more than one attacker assaulted Mr. Aguirre first making the assumption that the man will be harder to take out.

*Id.* Because "Sgt. Pippins' report and testimony do not entertain these hypotheses or test them against the available evidence," *id.*, his testimony provides no "useful information about the number of attackers or the order of attacks." *Id.*

119.    Thus, the expert testimony that the prosecution relied on to carry its burden to show a single person committed both murders was nothing more than unscientific and unfounded speculation.

I.    **Det. Robertson's history of falsifying reports and conducting shoddy investigations—not disclosed to Gonzales' trial counsel—undermines his credibility in the Gonzales investigation.**

120.     Before he became the lead investigator in the murder of the Aguirres, Det. Robertson had a long history of falsifying reports and unprofessional investigations. The State disclosed none of this information to the defense at either of Gonzales' trials.

### 1. Robertson is forced out of the El Paso Police Department after multiple incidents of misconduct (1973-1978).

121.     Snow Robertson's law enforcement service records detail a 40-year history of shoddy and dishonest work performance and civilian abuse allegations. He started his law enforcement career as a peace officer with the El Paso Police Department (El Paso PD) in 1973. El Paso PD Personnel Records of Snow Robertson at 1 (Exhibit 52). In 1974, Robertson graduated from El Paso Police Academy to enter the El Paso Police Department. Texas Commission on Law Enforcement Report on Snow Robertson (Exhibit 53). In his first performance evaluation, his evaluator noted that he "needs a lot of improvement…plan, observe rules, learn to make decisions…sense and accept more responsibilities." El Paso PD Personnel Records at 11. Specifically, the evaluator found Robertson's performance deficient in several areas, including: "ability to make sound decisions and work assignments," "accuracy, neatness, and thoroughness of work," and "work knowledge and job skill level." *Id*. Two months later, Robertson's performance did progress, although his "performance in new situations" and "work knowledge and job skill level" still required attention. *Id*. at 12.

122.     In 1976, El Paso PD received an abuse allegation regarding Robertson. In a letter addressed to the mayor of El Paso, the assistant city attorney noted several arrestees accused Robertson of abuse. *Id*. at 23. However, the city attorney concluded the allegations were baseless. *Id*. In the same year, a Personnel Incident Report was filed against Robertson for repeatedly cursing at a gas pump attendant who requested a work order to repair his patrol

vehicle. *Id*. at 13-14. After investigating the incident, El Paso PD Lieutenant Cueller

recommended an investigation by El Paso PD Internal Affairs. *Id*. at 14.

123.    The El Paso PD documented another 1976 Personnel Incident Report against

Robertson, based on a civilian complaint of excessive force, making threats, and false arrest

without a warrant. El Paso PD Personnel Records at 15-16. The incident concerned Daniel

Chacon, a boy with Intellectual Disability. Around midnight, Robertson knocked on the door of

Chacon's home. When no one responded, Robertson entered through the window. *Id*. at 15, 20.

Chacon, frightened, remained in his room while Robertson and his partner roamed the dark

house with flashlights and guns drawn. *Id*. at 15, 21.

124.    Robertson located Chacon in his bedroom and handcuffed him without providing

a warrant or the probable cause for the detention. *Id*. at 20. Chacon resisted and attempted to

show the officers his social security card. The officers then punched Chacon, knocking him

down. While he was on the ground, Robertson kicked Chacon in the ribs twice. *Id*. at 15-16.

According to Chacon, Robertson then stuck the barrel of his gun into Chacon's mouth, chipping

a tooth and bruising his mouth. Robertson took Chacon to the police car when a next-door

neighbor confirmed Chacon lived at the house Robertson entered. *Id*. at 16. Upon verifying this

information, he released Chacon from custody but threatened to jail Chacon for two years if he

reported the incident. *Id*.

125.    Robertson was issued a notice of termination for the Chacon incident on August

25, 1976. *Id*. at 17-21. The El Paso PD found reasonable cause to dismiss Robertson for violating

federal, state, and municipal laws in the encounter and his use of extreme verbal and physical

abuse against Chacon. The department also determined Robertson provided false statements to

investigators about the incident. *Id*. at 21. During his 3-year tenure with the police force, the

department emphasized that community members had lodged 15 other complaints against Robertson. *Id*. These complaints included five verbal or physical abuse cases, one civil rights case, and at least six brutality cases. *Id*. But the Civil Service Commission heard Robertson's appeal and overruled his termination. Instead, the Commission ordered the El Paso PD to reduce Robertson's termination to a suspension for 9 months. *Id*. at 24-25.

126.    On June 26, 1978, the El Paso PD gave Robertson a 60-day suspension. He was suspended for lying about his involvement in a car crash when attempting to escort an ambulance by driving against a red light. *Id*. at 7-10. Immediately after the collision, Robertson washed the car to avoid notifying his superiors of the accident. *Id*. at 9. A month after his car accident, Robertson received a poor performance review highlighting he "does not follow departmental rules and regulations" and that he "does not follow directions, tries to do as he pleases." *Id*. at 26. Robertson resigned from the El Paso PD on July 14, 1978. *Id*. at 2-4.

### 2.    Robertson is accused of multiple acts of misconduct as an Odessa police officer (1978-1999).

127.    On July 17, 1978, Robertson started as a police officer with the Odessa Police Department. Odessa PD Personnel Records of Snow Robertson at 1,3 (Exhibit 54). He stayed there for two years before resigning for undisclosed reasons. *Id*. at 2 ("vol. resignation" "10-20-80"). In October 1980, Robertson applied for a Deputy Sheriff position within the Ector County Sheriff's Office (ECSO). He reportedly sought "better working conditions." ECSO Personnel Records of Snow Robertson at 2-3 (Exhibit 55). When asked his reason for leaving El Paso on the ECSO form, Robertson cited "better pay" without mentioning his record of misconduct. *Id.* at 3. The ECSO hired him, but he worked there for only a matter of days before resigning because of a "personal" matter. *Id*. at 1. On December 1, 1980, OPD reinstated him as a police officer where he remained employed until 1999. OPD Personnel Records at 3.

128.     In October 1987, Robertson was disciplined for an allegation of abuse against a civilian as an OPD officer. OPD suspended Robertson from pay for three days, likely in connection with the allegation. OPD Personnel Records at 3.

129.     In a 1989 lawsuit filed in the 358th Judicial District Court, a juvenile alleged that Robertson assaulted him with no probable cause or justification. *See* Plaintiff's Amended Petition, *Homsey v. Robertson*, No. D-80,401 (358th Judicial Dist. Ct., Ector Cty., March 23, 1989) (Exhibit 56). Among the grounds for the suit, the complainant alleged the City of Odessa was negligent in hiring Robertson given his past misconduct at the El Paso PD. *Id*. at 3. The parties eventually settled out of court. Order of Dismissal, *Homsey v. Robertson* (Nov. 7, 1990), at 2 (Exhibit 57).

130.     Robertson was sued again for a May 1988 incident in which it was alleged he physically assaulted a woman during a routine traffic stop. Plaintiff's Original Petition, *Orr v. Robertson*, No. D-82,765 (358th Judicial Dist. Ct., Ector Cty., Jan. 7, 1991) (Exhibit 58), at 3-4. The City of Odessa and the plaintiff settled out of court. Order of Dismissal, *Orr v. Robertson* (Jan. 7, 1991) (Exhibit 59).

131.     In November 1995, the month before Gonzales' trial commenced, Robertson was suspected of having manufactured evidence and providing false testimony to gain a conviction in Lincoln Keith's homicide case. Keith, a teenager at the time of the offense, was convicted for his role as the alleged triggerman in a murder-for-hire plot. *See* Application for 11.07 Writ of Habeas Corpus, *Ex Parte Keith*, No. WR-59, 244-04 (Tex. Crim. App. June 12, 2015) (Exhibit 60). Robertson worked the case as a lead investigator. In 2015, Keith filed a subsequent application for writ of habeas corpus in the Court of Criminal Appeals, raising several bases for relief on newly discovered evidence about Robertson's false testimony. *Id*. at 18.

132.    Keith alleged the prosecution's only evidence to support its theory of his involvement was accomplice testimony of a third-party and, significantly, Robertson's testimony regarding Keith's "blurted" confession. *Id*. In an incident strikingly similar to Gonzales' supposed "confession" to jailer Charles Kenimer, Robertson testified that Keith "blurted out" an extensive statement in which he confessed to all elements of the charge against him when several police officers were within earshot. Yet, no one else could verify this statement. *Id*. *See* Excerpts of Volume 8, Reporter's Record of *State v. Keith*, Cause No. A-24,045 (70th Judicial Dist. Ct., Ector Cty.), at 22-25, 41-52 (Exhibit 61) ("Keith Transcript") (Robertson testifying other officers were near, but he did not know whether they heard Keith's statement); *id.* at 66-68 (OPD Sergeant Matt Andrews testifying he was in the same room as Robertson and Keith but did not hear Keith's statement).

133.    Robertson's colleague, Ector County Medical Examiner Investigator B.J. White, testified he rode to the station with Robertson and Keith following the "blurted" confession, and Robertson never mentioned it to him. Ex. 60 at 18; 8 Ex. 61 at 91, 93. White only heard Robertson recite to Keith warnings under *Miranda v. Arizona* 384 U.S. 436 (1966). Ex. 60 at 19, Ex. 61 at 94.

134.    Keith also alleged Robertson maintained a pattern of claiming that "suspects 'blurted out' spontaneous statements that no one other than he himself had heard." Ex. 60 at 19. As proof, Keith revealed that another young suspect named Cleaver had supposedly made a spontaneous, unverified statement confession to a murder in front of Robertson in similar circumstances. *Id*., *Ex Parte Keith* Writ App. Ex. "E" (Cleaver Article) (Exhibit 71), However, Cleaver's attorney successfully struck Robertson's testimony because Cleaver's "confession" mirrored Keith's. *Id.* Cleaver's trial judge also presided over Keith's trial. *Id*. Keith also alleged

Robertson was romantically involved with the prosecutor in Keith's case, Linda Deaderick,

during Keith's 1995 trial. Snow Robertson and Linda Deaderick were later married in 1996. *Ex

Parte Keith* Writ App. Ex. "F" (Robertson-Deaderick Article) (Exhibit 72).[19]

135.    In July 1998, OPD placed Robertson on unpaid suspension for undisclosed

reasons. Ex. 54 at 3. On June 14, 1999, Robertson resigned from the Odessa Police Department.

*Id*.

### 3.    Robertson disciplined at the Allen Police Department (1999-2006).

136.    Three weeks later, Robertson joined the Allen Police Department ("APD") as a

police officer. Allen PD Personnel Records at 1 (Exhibit 62) (starting 1999). In July 2002, APD

suspended Robertson for a week for providing a colleague's social security number to a third-

party. *Id.* at 2-5 (July 5, 2002 Order of Suspension). Robertson retired from the APD in

September 2006, *id.* at 6 (Notice of Retirement), and started at the Murphy Police Department in

October 2006. Murphy PD Personnel Records at 2 (Exhibit 63).

### 4.    Robertson's poor performance continues at the Murphy Police Department (2006-2015).

137.    Robertson was again cited for poor work habits at the Murphy Police Department

(2006-2015). *See generally id.* 2-13. At the time of the resentencing, Robertson's supervisors

found his work unsatisfactory. *Id.* at 9 (Mar. 30, 2010 evaluation). Robertson showed "a lack of

integrity" by not taking "responsibility as a supervisor." *Id.* at 12. In 2011, Robertson was

reprimanded for ordering an officer to shoot a caged bobcat without contacting supervisors or

considering other options. *Id*. at 15.

---

[19] Deaderick served as an assistant district attorney at the time of Gonzales' prosecution but did not work on the 1995 trial. She became First Assistant and was working on the case when the Ector County District Attorney moved to recuse itself in November 2008 based on her marriage to Robertson. Mot. to Recuse, Nov. 13, 2008, 3 CR-R 651.

### J.    Based on the post-trial evidence set forth above and police records, Martha Reyes' testimony at the resentencing trial is not credible.

138.    Reyes testified only in the 2009 resentencing trial, not the 1995 trial. In 2000, the Odessa Police Department reinvestigated the case at the insistence of the Aguirre family. On June 7, 2000, Reyes was interviewed by two officers, Larry Bartlett and Buzzy Abalos. Martha Reyes Interview, June 7, 2000 (Exhibit 64). In this interview, she provided the story that she eventually gave in abbreviated form in her testimony at the resentencing trial, detailed *supra*.

139.    In sum, Reyes testified that Gonzales asked her to go to the Aguirres' home the night of April 21, 1994, to visit with the Aguirres for a while. When she left the Aguirres, Gonzales would come into their house. His plan was "to push [them] around … get a VCR … and pawn it," 27 RR-R 62, to get enough money to celebrate their daughter's upcoming birthday. Reyes went to the Aguirres' house about 9:00 p.m., and as she left at about 10:00 p.m., she saw Gonzales coming toward the door. When he came back, "[h]e had blood on his clothes" and told her "[t]here was an accident." *Id*. at 66. The only property that she saw he had stolen was a VCR. *Id*. at 67.

140.    This story is not credible, because additional details Reyes provided in her 2000 interview, which were omitted from her testimony, are contradicted by other facts, and because her testimony conflicts with a critical element of her 1994 statement to the police.

141.    In her 2000 interview, Reyes said when Gonzales went to the Aguirres' home, he "had a flannel on." 2000 Reyes Interview at 8. He came back from the Aguirres with "blood all over him." *Id*. at 4, 9. "[H]e had blood here. Blood there. Everywhere." *Id*. at 17. Neither observation, about the flannel shirt or about the blood on him, can be true. If he was wearing a flannel shirt, it too would have been covered in blood. However, the flannel shirt traced back to Gonzales was not covered in blood. As bloodstain pattern analysis expert Paulette Sutton has

found, "[t[he distribution of the bloodstains on this flannel shirt is indicative of the shirt being worn during incidental contact with exposed blood belonging to Mr. and Mrs. Aguirre," Ex. 41 ¶ 14 (2d Sutton Aff., 2-12-22), and "[is] not indicative of the distribution that would be created during this violent assault." *Id*. ¶ 15. Thus, the shirt was not worn during the attack on the Aguirres. Instead, Gonzales gave the shirt to a bloody Jesse Perkins, by Perkins' admission to Nino, soon after the attack.

142.    Moreover, it appears there are stains on the inside of the shirt consistent with the wounds Perkins suffered during the attack on the Aguirres—stains that would also be consistent with Perkins putting the shirt on after the attack. These facts show that Reyes' story, in critical part, cannot be true.

143.    Reyes' statements that Gonzales came back from the Aguirres with "blood all over him," and that "he had blood here[,] [b]lood there[,] [e]verywhere," 2000 Reyes Interview at 4, 9, 17, cannot be true for yet another reason. As we have detailed, *supra*, the day after the murders, the police tested Gonzales' arms, hands, clothing, and shoes with luminol. 20 RR-T 29, 31-33. On May 7, the day of Gonzales' arrest, the police conducted more luminol testing in Gonzales' house, finding what they believed to be a bloodstain on the carpet. Ex. 13 (Sanders Report of 218 Schell Search). Further analysis revealed that no blood was present on Gonzales, on any article of Gonzales' clothing, or in any place in the house. Ex. 15 (Jan. 13, 1995 DPS Report). Had Gonzales returned from the Aguirres' house with blood on him in the quantity Reyes described, then washed a bloody knife in the sink, and then cleaned up, as she said he did, the police investigation would have found traces of blood in their effort to find it.

144.    As we have noted, Reyes gave a statement to the police on May 7, 1994. Exhibit 47. Nothing in that statement mirrors what she told the police in 2000 and her testimony in 2009.

However, she does mention in that statement that she first noticed items in her house that appeared to be some of the items taken from the Aguirres on April 23, 1994—two days after the murder. *Id*. Those items appeared only after she heard Gonzales talking with other men outside their house that night. *Id*. Thus, her testimony in 2009 about seeing a VCR the night of the murders is in sharp conflict with that very specific memory recounted to the police only two weeks after the incident occurred—an account that more closely matched the memory of Gonzales' mother.

145.    The other set of facts contradicting Reyes' story concern a visit by Gonzales' sister Michelle Payne to the Gonzales/Reyes home the night of April 21, 1994. Ms. Payne did not testify at either trial, but OPD officers interviewed her twice, on May 6, 1994, and on June 2, 2000. Michelle Payne Interview, May 6, 1994 (Exhibit 65); Michelle Payne Interview, June 2, 2000 (Exhibit 66). Payne recounts in her first interview that she came to visit Michael and Martha at their house at about 8:30 pm on April 21, 1994 (the night of the murders) and was there "for about thirty minutes." 1994 Payne Interview at *163. When she arrived, Michael, Martha, and their daughter Unica "were all siting in there just watching TV in the dark." *Id*. at *164. While she was there, Gonzales asked her if she wanted to buy a camcorder and an expensive camera with a long lens, acknowledging that both were "stolen stuff." *Id*. at *163, *165, *166.[20] Payne left about 9:00 pm but came back about five minutes later because she

---

[20]A camcorder was not among the items reported stolen from the Aguirres. An expensive camera with a long lens was. In her second interview in 2000, however, Payne discussed the camera again. In that interview she told the police that she walked through the house the night of April 21 and noticed no VCR or any other property there that seemed to be from someone else. Ex. 66 at 20. She also recalled in this interview that the occasion when Gonzales asked her if she wanted to buy the camera with the long lens was at Unica's birthday party, the Saturday after Unica's April 27 birthday. *Id*. at 21. That would have been April 30, 1994, which coincides with the time that Epigmenia Gonzales told the police she first noticed property consistent with the

thought she had left her purse. *Id*. at 164. When she arrived, she "pulled up and honked," and Gonzales come from the back of their house with "a friend…" *Id*. at *164-65. In her 2000 interview, she recounted that Gonzales came to her car, went back into the house to look for her purse and came back to tell her it was not there, after which she found her purse in the trunk of her car. Ex. 66 at *20. During all this time, Gonzales "seemed just fine." *Id*. at *21.

146.    Payne's very consistent and detailed accounts completely contradict Reyes' account of Payne's visit in Reyes' 2000 interview. In that interview, Reyes said that Payne came by that night but came by *after* the murders had occurred. Reyes Interview at 9. By that time, Gonzales had "already cleaned up." Ex. 64 at 10 (2000 Martha Reyes Interview). When she got there Payne "never got off [sic] the car," *id*., and Gonzales did not go out to see her but talked to her from inside the door of their house. *Id*. at 10-11. Payne wanted him or Martha to go to the store with her, and when Gonzales refused, Payne "got mad and she took off…." *Id*. at 11.

147.    The contradictions between Payne's and Reyes' account are obvious. According to Reyes, when Payne arrived, the murders had already occurred, Gonzales had brought the Aguirres' property into their house, and he had cleaned up. By Reyes' timeline of events, this would have been 10:30 pm or later, because Gonzales went into the Aguirres' at 10:00, came back 10-15 minutes later, made two more trips to bring back property, and then got cleaned up. By contrast, Payne said she got there about 8:30 and was there, including coming back to find her purse, until about 9:15. Reyes said Payne stayed in her car, and Gonzales talked with her from inside the front door. Payne said she went into their house and was there for about 30 minutes, saw no extraneous property in the house, and saw that Gonzales, Reyes, and Unica were

---

Aguirres' stolen property in her house—after Julian Olivarez was there. *See* Interview of Epigmenia Gonzales, May 31, 2000.

watching TV—and that Gonzales seemed fine. Any effort by Gonzales to sell her a piece of property from the Aguirres did not take place that night, but nine days later.

148.    Both Payne's and Reyes' accounts of Payne's visit to the Gonzales/Reyes house on the evening of April 21, 1994, cannot be true. The details and consistent story of that evening from Michelle Payne in interviews by the police over a six-year period stand in stark contrast to the wholly inconsistent stories from Reyes in interviews by the police over that same period.

149.    In sum, Reyes' trial testimony, built as it was on her 2000 interview, is not credible.

K.    **Police have just provided Gonzales newly discovered fingerprint evidence that could exonerate him.**

150.    Just a few weeks before Gonzales' execution, after diligent efforts by counsel for Gonzales,[21] police have finally disclosed a large tranche of new documents regarding fingerprint and footwear comparison in the case. *See* Ex. 42 (Bothwell Aff.). Odessa Police Crime Scene Supervisor Bothwell believed the latent print cards from the case had been lost. But in early February, she discovered them, placed out of order in a storage box, and the City of Odessa released them in response to a public records request.[22] Gonzales has now learned that Odessa Police had the following:

- 136 latent print cards taken from the crime scene and from the stolen property.

---

[21] *See* History of Gonzales' Efforts to Obtain Fingerprint and Footwear Evidence (Exhibit 67).

[22] This disclosure is especially remarkable because it was made in spite of the obstruction posed by the attorney for the State, who—when asked about fingerprint and footwear evidence—stated he had no obligation to learn of any potentially exculpatory information contained in the police's file. The District Attorney Pro Tem has refused to "learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see* CR-DNA 66 (District Attorney Pro Tem only assuring that he will disclose evidence that "comes to [his] attention"); CR-DNA 84 (District Attorney Pro Tem disclaiming "authority to tell [Odessa police] what to do or not do").

- 19 sets of known fingerprints from the victims, victim's family, witnesses, and several suspects besides Gonzales. These include the fingerprints of suspects Jesse Perkins, Daniel Lugo, but inexplicably not Julian Olivarez.

- footwear test impressions from Manuel Aguirre, Jr.'s shoes taken on April 22, 1994.

- Documentation of 12 searches of latent prints against the AFIS database.

151.   This is far more prints than the State had disclosed. *See* Affidavit of Matthew Marvin, May 14, 2021, ¶¶ 9-11 (Exhibit 68) (summarizing OPD reports on fingerprint and footwear evidence collection; estimating about 80 prints). Of the 136 latent print cards,[23] latent print examiners working with Mr. Gonzales' team have identified at least **66 latent prints suitable for comparison—of which 60 have never before been compared**. Affidavit of Latent Print Examiner Heather Mcneill, February 28, 2022 ¶ 6 (Exhibit 69).[24] To conduct a reliable forensic examination, examiners use a methodology called "ACE-V"-- Analysis, Comparison, Evaluation and Verification. *Id.* ¶ 7. It is a time-consuming process to make comparisons for

---

[23] These do not include the latent print card lifted from the stereo that identified Gonzales—presumably because that card was admitted in evidence as SX 60.

[24] This is the first step in the standard latent print examination procedure:

The examiner makes a determination, based upon previous training, experience, understanding, and judgments, whether the print is sufficient for comparison with another print. If one of the prints is determined to be insufficient, the examination is concluded with a determination that the print is insufficient for comparison purposes.

*See* National Institute of Justice, *The Fingerprint Sourcebook* 9–13 (2011), https://www.ojp.gov/pdffiles1/nij/225320.pdf/; *see also id.* Appendix D: SWGFAST Standard Terminology of Friction Ridge Examination, v. 3.0 ("Suitable. The determination that there is sufficiency in an impression to be **of value** for further analysis or comparison.") (emphasis added).

purposes of identification or exclusion, but the results could be strongly exonerating for Gonzales.

152.    Matt Marvin is a lab director at Ron Smith & Associates, a private accredited lab that assists law enforcement and consults in post-conviction cases in several forensic disciplines. Marvin is one of only a handful of forensic specialists in the country with the highest credentials in footwear and fingerprint examination. *See* Ex. 68. Heather Mcneill is another latent print examiner with Ron Smith & Assocs. She has previously earned the same high credentials in latent print examination and is an expert print examiner. The Ron Smith laboratory—which is the only accredited private lab capable of handling this review—estimates that "a complete examination of the latent print evidence will require at least 6 months." Ex. 69 ¶ 7.

153.    This newly discovered print evidence provides critical context for the State's identification of Gonzales' prints on the stolen stereo. The police had discovered dozens of other prints that were suitable for comparison but utterly failed to investigate the significance of any other print. The State cannot say how many other identifications it could make from the stolen property, because the police apparently did not even try to do so.

154.    What is more, for the few prints that the police did enter into the law-enforcement database for fingerprint matches, OPD had a practice of not documenting any result that did not result in a match. According to the supervisor of the Odessa Police Department Crime Scene Unit, "at the time of the Michael Gonzales case, the practice was to write a report on AFIS entries that resulted in a positive identification. A report was not written when a latent was entered into AFIS." Bothwell Affidavit ¶ 4. This practice had the effect of concealing potentially exculpatory information (non-matches) that the police were aware of.

155.    Finally, based on the newly available test footwear impression, Mr. Marvin has

been able to exclude Manuel Aguirre Jr. as the person who left the bloody footwear impression

between the living room and the kitchen. *See* Footwear Examination Report of Matt Marvin,

February 11, 2022 at 2 (Exhibit 70). This is significant, because if the victims' son did not leave

the impression upon discovering the crime on the morning of April 22, it makes it far more likely

that the person who left that impression was an assailant on the night of April 21. This new

information further underscores the impact of the police's failure to adequately conduct an

investigation of the homicide: had they collected footwear impressions from alternate suspects

Perkins, Lugo, and Olivarez during their investigation, they may well have been able to identify

the real perpetrators.

## **CLAIMS FOR RELIEF**

156.    Mr. Gonzales re-alleges and incorporates herein by reference all the allegations

contained in the preceding paragraphs of this Complaint.

## I.    **FIRST CLAIM FOR RELIEF: DENIAL OF DUE PROCESS**

157.    Pursuant to Chapter 64, when an individual sentenced to death, such as Mr.

Gonzales, presents a motion that requests DNA testing of biological material that both still exists

in a condition which makes testing possible and could yield exculpatory results, he or she is

entitled to have the evidence tested. Tex. Code Crim. Proc. art. 64.03 (2017). If testing

successfully produces an unidentified DNA profile, that profile must be compared to the FBI's

CODIS database, and to the database established by the Department of Public Safety. Art. 64.035

(2011).

158.    Exculpatory DNA results are accepted under Texas law as evidence that can be

used to prove a claim for habeas relief brought under Articles 11.071 and 11.073 of the Texas

Code of Criminal Procedure, based on innocence, innocence of the death penalty, false or

misleading testimony, and other constitutional violations. Exculpatory DNA results may also be considered by the Board of Pardons and Paroles and the Texas Governor in an available request for executive clemency. *See State v. Holloway*, 360 S.W.3d 480, 489 n.58 (Tex. Crim. App. 2012), *abrogated on other grounds*, *Whitfield v. State*, 430 S.W.3d 405, 409 (Tex. Crim. App. 2014).

159.    Because the State of Texas has created a procedure through which convicted persons can obtain DNA testing and then utilize exculpatory results from that testing to secure habeas relief, executive clemency, and potentially other relief from their convictions and death sentences, the process employed by the State for obtaining access to DNA must not violate fundamental fairness. *See Osborne*, 557 U.S. at 69; *Skinner*, *supra*; *Elam v. Lykos*, 470 F. App'x 275, 276 (5th Cir. 2012) ("While there is no freestanding right for a convicted defendant to obtain evidence for post-conviction DNA testing, Texas has created such a right, and, as a result, the state provided procedures must be adequate to protect the substantive rights provided."); *Emerson v. Thaler*, 544 F. App'x 325, 327 (5th Cir. 2013) ("Although states are under no obligation to provide mechanisms for postconviction relief, when they choose to do so, the procedures they create must comport with due process and provide litigants with a fair opportunity to assert their state-created rights.").

160.    Chapter 64 on its face and as construed by the CCA violates fundamental fairness. On its face and as construed by the CCA, the statute effectively precludes DNA testing.

161.    Article 64.03(a)(2) requires movants to show by a preponderance of the evidence that they would not have been convicted if exculpatory results had been obtained by DNA testing. This is a particularly high standard of proof. Forty-four states and the federal government require testing to be performed based on a showing that is more movant-friendly than the Texas

standard. Thirty-five state and federal statutes use lower standards of proof, usually some variation on requiring a showing of "reasonable probability" of acquittal.[25] Ten (10) states require testing when the prisoner makes a showing of relevance or material relevance or a prima facie showing of relief, i.e., a standard that is at least as movant-friendly as the reasonable

---

[25] The following thirty-five statutes require testing when the prisoner makes a showing that meets a reasonable probability standard (with a number of variations in the precise wording):

18 U.S.C. § 3600(a)(8)(B); Ala. Code 1975, § 15–18–200(f)(2); Alaska Stat. Ann. § 12.73.020(9)(B) (West); Ariz. Rev. Stat. Ann. § 13-4240.B.1; Ark. Code Ann. § 16-112-202(8)(B) (West); Cal. Penal Code § 1405(g)(5) (West); Conn. Gen. Stat. Ann. § 54-102kk(b)(1) (West); D.C. Code Ann. § 22-4133(d) (West 2001); Fla. Stat. Ann. § 925.11(f)(3) (West 2006); Ga. Code Ann. § 5-5-41(c)(3)(D) (West 2012); Haw. Rev. Stat. Ann. § 844D-123(b)(1) (West); Ind. Code Ann. § 35-38-7-8, sec. 8(4) (West); Iowa Code § 81.11(1)(e) (2019); Ky. Rev. Stat. Ann. § 422.285(5) (West 2013); La. Stat. Ann. § 926.1(C)(1) (2014); Md. Code Ann. Crim. Proc. § 8-201(d)(1)(i) (West 2018); Miss. Code Ann. §§ 99-39-5(1)(f), 99-39-9, 99-39-11 (West) (petitioner entitled to testing on allegation DNA testing would provide reasonable probability of different outcome, unless pleading facially inadequate); Mo. Ann. Stat. § 547.035.2(5) (West); Mont. Code Ann. § 46-21-110(5)(d) (West 2015); Nev. Rev. Stat. Ann. § 176.09183.1(c) (West 2013); N.J. Stat. Ann. § 2A:84A-32a(d)(5) (West 2016); N.M. Stat. Ann § 31-1A-2(D)(5) (West 2010); N.Y. Crim. Proc. Law § 440.30(1-a)(a)(1) (McKinney 2020); N.H. Rev. Stat. Ann. § 651-D:2.III(e) (2010) (must prove by a preponderance of the evidence "that there is a reasonable probability that the petitioner would not have been convicted"); N.C. Gen. Stat. Ann. § 15A-269(b)(2) (West); Okla. Stat. tit. 22, § 1373.4(A)(1) (West); Or. Rev. Stat. Ann. § 138.692(6)(b) (West); 42 Pa. C.S.A. § 9543.1(d)(2) (West); 10 R.I. Gen. Laws Ann § 10-9.1-12(a) (West); S.C. Code Ann. § 17-28-90(B)(5); Tenn. Code Ann. § 40-30-304(1) (West); Utah Code Ann. § 78B-9-301(2)(f)(ii) (West); Vt. Stat. Ann. tit. 13 § 5566(a)(1) (West); W. Va. Code Ann. § 15-2B-14(c)(1)(B) (West); Wis. Stat. Ann. § 974.07(7)(a)(2) (West 2011).

probability standard.[26] Only five states use a standard similar to Texas—of which only three use the death penalty.[27]

162.     As construed by the Texas Court of Criminal Appeals, article 64.03(a)(2) is even harder to meet. The statute places no express limit on the use of non-DNA post-trial evidence to satisfy the preponderance standard. Yet the CCA has held that the convicting court must focus its inquiry solely on the effect of "exculpatory results" from DNA testing, without consideration of other "post-trial factual developments." *See Hall v. State*, 569 S.W.3d 646, 656 (Tex. Crim. App. 2019) ("In considering the likelihood of conviction, we limit our review to whether exculpatory results would alter the landscape of evidence at trial, and we do not consider post-trial factual developments.").

163.     This additional evidentiary limitation makes the Texas statute more onerous than some other statutes that impose a similar legal standard. *See State v. Riofta*, 209 P.3d 467, 469 (Wash. 2009) ("In determining whether a convicted person 'has shown the likelihood that the

---

[26] Del. Code Ann. tit. 11, § 4504(a)(5) (West) ("materially relevant"); Kan. Stat. Ann. § 21-2512(c) (West 2013) ("relevant"); Me. Rev. Stat. Ann. tit. 15, § 2138(4-A)(E) ("material"); Mass. Gen. Laws ch. 278A, § 7(b)(4) (West) ("material"); Mich. Comp. Laws Ann. § 770.16(4)(a) (West) ("material"); Minn. Stat. Ann. § 590.01(c)(2) (West) ("materially relevant"); Neb. Rev. Stat. Ann. § 29-4120(5)(c) (West) ("relevant"); N.D. Cent. Code Ann. § 29-32.1-15(3)(b) (West) ("materially relevant").

Illinois requires testing on a showing of either material relevance to an assertion of innocence or reasonable probability of acquittal. 725 Ill. Comp. Stat. Ann. 5/116-3(c)(1) (West). Finally, Wyoming provides that a court may order testing on prima facie showing of actual innocence. Wyo. Stat. Ann. § 7-12-305.

[27] Colo. Rev. Stat. Ann. §  18-1-413(1)(a) (West) (showing of actual innocence by a preponderance); Idaho Code Ann. §  19-4902(e)(1) (West 2014) (showing innocence more probable than not); Ohio Rev. Code Ann. § 2953.74(B)(1) (West) (evidence that would have been outcome determinative at trial); S.D. Codified Laws § 23-5B-1(9) (showing that would establish actual innocence); Wash. Rev. Code Ann. § 10.73.170(3) (West) (show that innocence more probable than not). Thus, forty-two states and the federal government require testing to be performed based on a showing that is more movant-friendly than the Texas standard.

DNA evidence would demonstrate innocence on a more probable than not basis,' a court must look to whether, viewed in light of all the evidence presented at trial or newly discovered, favorable DNA test results would raise the likelihood that the person is innocent on a more probable than not basis.").

164.     This disables a petitioner from securing DNA testing in exactly the situation in which that testing would be most compelling: where trial evidence is proven false, where exculpatory and impeaching evidence was hidden by the state, and where non-forensic evidence gathered after trial tends to show the petitioner's innocence. For example, a defendant whose trial was infected by unreliable forensic evidence and who has secured new scientific evidence that the forensic testimony was or is false will not be able to obtain exonerating DNA testing because—for Chapter 64 purposes—that forensic testing is presumed to be correct. Or a defendant who learned after trial that he was denied access to exculpatory evidence in the state's possession before trial would be barred from introducing the exculpatory information.

165.     In Mr. Gonzales' case, all of these types of new evidence tend to undermine the weight of the trial evidence and strengthen his showing that the jury would not have convicted him. Yet the CCA's interpretation of Chapter 64 prevents these facts from mattering, and thus impermissibly raises the bar for receiving DNA testing.

166.     The combined effect of Texas' unusually high standard and its restrictions on which evidence may be used to satisfy that standard effectively precludes a movant from securing testing to establish innocence.

167.      By refusing to release the biological evidence for testing, and thereby preventing Plaintiff from gaining access to exculpatory evidence that could have led to his acquittal and/or demonstrated that he is not death eligible because he was not a principal in the Aguirres'

murders, or established mitigating circumstances, Defendants have deprived Plaintiff of his liberty interests in utilizing state procedures to obtain an acquittal and/or reduction of his sentence, in violation of his right to due process of law under the Fourteenth Amendment to the Constitution of the United States.

168.    Lastly, Chapter 64 on its face and as applied here by the trial court provides an unconstitutional and arbitrary limitation on defendants' right to access to evidence in cases in which the evidence has been previously tested, but new DNA technology may generate more accurate and probative results than before. The statute ostensibly allows for testing under these circumstances. Article 64.01(b)(2)(A) provides that DNA testing is permitted if "evidence … previously subjected to DNA testing … can be subjected to testing with newer techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." However, as interpreted in Mr. Gonzales' case, any

## II.    SECOND CLAIM FOR RELIEF: ACCESS TO COURTS

169.    Mr. Gonzales re-alleges and incorporates herein by reference the allegations contained in all of the preceding paragraphs of this Complaint.

170.    Mr. Gonzales has a fundamental right to access the courts, rooted in the First and Fourteenth Amendments, which requires that the states make available the tools necessary for prisoners to obtain meaningful access to available judicial remedies. State law must ensure that prisoners like Mr. Gonzales have meaningful access to post-conviction remedies to vindicate this right. *Cf. Bounds v. Smith*, 430 U.S. 817, 828 (1977) (holding that prison authorities are required to provide inmates meaningful legal assistance or resources to effectuate their constitutional right of access to courts).

171.    As alleged above, Mr. Gonzales has available remedies under Texas law for access to post-conviction DNA testing, to judicial relief from his conviction and death sentence,

and to executive clemency, based on the exculpatory results of such testing. And, as alleged above, Texas' restrictive procedure for obtaining access to DNA testing under Article 64, and the CCA's interpretation thereof, is not adequate, meaningful, or effective. If DNA testing reveals exculpatory results in a death-penalty case, Articles 11.071 provides "the proper and exclusive vehicle for obtaining judicial relief" from the conviction. *Holloway*, 360 S.W.3d at 488.

172.    Article 11.071, § 5(a)(2) provides that a petitioner may receive merits review of a claim by showing that "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt."

173.    Texas courts permit relief for substantive claims of innocence under the U.S. Constitution. *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996).

174.    Moreover, Texas courts afford relief when new scientific evidence that was not available at the time of trial demonstrates by a preponderance that a defendant would not have been convicted. *See* Tex. Code Crim. Proc. art. 11.073.

175.    Exculpatory DNA results can also provide the basis for a request for executive clemency under Texas law. Moreover, exculpatory DNA results can provide the factual basis for a showing of innocence necessary for the federal courts to consider a successive federal habeas petition pursuant to 28 U.S.C. § 2244.

176.    Yet exculpatory DNA testing results are the critical, even dispositive, factual predicate for accessing these remedies. And without the DNA testing, a petitioner's access to the remedies afforded by Article 11.071 and Article 11.073 are illusory. *Ex parte Kussmaul*, 548 S.W.3d 606, 634 (Tex. Crim. App. 2018) ("We have previously noted that the legislature clearly intended Article 11.073 and Chapter 64 to work together."); *Routier v. State*, 273 S.W.3d 241,

259 n.76 (Tex. Crim. App. 2008) (exculpatory DNA test results may be necessary, but not always sufficient, to satisfy *Elizondo* standard).

177.    Mr. Gonzales incurred actual injury when the CCA denied his request for DNA testing that could potentially produce exculpatory evidence, and thus provide him with relief from his conviction and death sentence.

178.    As stated above, the CCA's unreasonable interpretation of Chapter 64 has prevented Mr. Gonzales from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder, and that he is innocent of the death penalty. These failures have deprived Mr. Gonzales of his fundamental right to access the courts under the First and Fourteenth Amendments.

## III.    THIRD CLAIM FOR RELIEF: CRUEL AND UNUSUAL PUNISHMENT

179.    Mr. Gonzales re-alleges and incorporates herein by reference all the allegations contained in the preceding paragraphs of this Complaint.

180.    The Eighth Amendment's prohibition on cruel and unusual punishment prevents the execution of a prisoner, like Mr. Gonzales, with viable claims of innocence of the death penalty, or seeks to establish mitigation related to the circumstances of the offense, without first affording the opportunity to prove innocence or mitigation. The Eighth Amendment provides additional assurance that proceedings in capital cases be reliable and fair. Yet Article 64 as written and as applied supplies no additional safeguards against wrongful execution by affording capital defendants an opportunity  no additional care violates the Eighth Amendment prohibition on cruel and unusual punishment.

## IV.     REQUEST FOR INJUNCTIVE RELIEF: RELEASE OF EVIDENCE FOR TESTING

181.    For the reasons stated above, the Constitution requires declaratory relief that the denial of DNA testing to Mr. Gonzales violates the Constitution and that Mr. Gonzales be afforded the opportunity to conduct DNA testing on the evidence identified in this Complaint. Further, Mr. Gonzales requests injunctive relief compelling those Defendants who are custodians of the evidence identified in this Complaint to release the evidence designated below for DNA testing. Accordingly, Mr. Gonzales asks this Court to grant prospective injunctive relief compelling the Defendants to release the evidence identified in this Complaint so that the requested DNA testing can be accomplished.

## PRAYER FOR RELIEF

182.    WHEREFORE, Plaintiff prays that the Court provide the following injunctive and declaratory relief:

183.    A declaratory judgment that Article 64 of the Texas Code of Criminal Procedure, as applied by the CCA, is unconstitutional because:

a.      It imposes a fundamentally unfair limitation, in violation of due process and the First Amendment right of access to the courts, upon Plaintiff's access to statutory remedies available under Texas law, and deprives Plaintiff of adequate, effective, and meaningful access to such remedies. Those remedies include: (1) the statutory right to access post-conviction DNA testing pursuant to Chapter 64; (2) the statutory right to habeas relief for constitutional violations pursuant to Articles 11.071 and 11.073 of the Texas Code of Criminal Procedure based on exculpatory DNA evidence; and (3) executive clemency based on exculpatory DNA results.

b.      It denies Plaintiff the protection of the Eighth Amendment of the Constitution, which requires that death sentences be reliable, and therefore guarantees persons facing the death penalty access to test evidence where realistically possible exculpatory results can prove innocence of the crime.

184.    A preliminary and permanent injunction requiring Defendants to produce and release for DNA testing the evidence set forth below, under an appropriate protocol regarding chain of custody and preservation and return of such evidence after testing has been completed.

185.    A stay of Mr. Gonzales' execution date, scheduled for March 8, 2022, based on (1) Gonzales' substantial possibility of success on the merits, (2) the certainty of irreparable harm to him, (3) the negligible harm in holding the State Defendants to their oath to see that justice is done, *see* Tex. Code Crim. Proc. art. 2.01, and (4) the public interest in maintaining an accurate and reliable system of justice. *See Hill v. McDonough*, 547 U.S. 573, 584 (2006).

Respectfully submitted,

Richard Burr
Texas Bar No. 24001005
Burr and Welch, PC
PO Box 525
Leggett, TX 77350
713-628-3391
dick@burrandwelch.com

*Counsel for Michael Dean Gonzales*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing Complaint will be served on

Defendant Woodson Erich Dryden via an email sent to Erich.dryden@oag.texas.gov and service

on the other Defendants will be made consistent with Federal Rule of Civil Procedure 5.


<u>/s/ Richard Burr</u>

Richard Burr