EXHIBIT 30

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| MICHAEL DEAN GONZALES, | ) | MO-99-CA-072 |
| Petitioner, | ) | |
| | ) | *Writ of Habeas Corpus Hearing* |
| | ) | *in a Death Penalty Case* |
| v. | ) | |
| | ) | *Volume 2* |
| | ) | |
| GARY JOHNSON, DIRECTOR TDCJ-ID, | ) | **March 16, 2001** |
| Respondent. | ) | |

**BEFORE THE HONORABLE ROYAL FURGESON**
*United States District Judge*
*In Midland, Texas*

FOR THE PETITIONER:     MR. STEVEN C. LOSCH
*Attorney at Law*
906 Delia Drive
Longview, Texas 75601
*(903) 234-1373*

                                    and

MS. ADRIENNE ZUFLACHT URRUTIA
*Attorney at Law*
12011 Huebner Road
Suite 210 F
San Antonio, Tx 78230
*(210) 690-1790*

FOR THE RESPONDENT:     MR. DAVID T. DUNCAN
*Assistant Attorney General*
*Assistant Chief, Capital Litigation Division*
P.O. Box 12548
Austin, Texas 78711
*(512) 936-1600*

**COURT REPORTER:**   **MR. DENVER B. RODEN, RMR**
*United States Court Reporter*
200 E. Wall, Rm. 313
Midland, Texas 79701-5248
*(915) 683-7784*

    The above styled and numbered cause was reported by mechanical stenography and produced by computer.

*Keyword Index Enclosed*

1 Mr. Kennimer, if you could, be sure and speak in a loud,
2 clear voice into the microphone.
3 　　　THE WITNESS: Yes, sir.
4 　　　THE COURT: Let me say, again, I realize that you
5 have been inconvenienced by the timing of your testimony,
6 that you were here yesterday and had to come back today, and
7 I do appreciate your patience with all of us as we try to
8 work this thing through. So, I appreciate that.
9 　　　THE WITNESS: No problem.
10 　　　THE COURT: Thank you very much, sir. You may
11 proceed.
12 　　CHARLES EUGENE KENNIMER, JR., PETITIONER'S WITNESS WAS SWORN
13 　　　　　　　　　　　DIRECT EXAMINATION
14 BY MR. LOSCH:
15 Q. Would you state your full name for the record?
16 A. Any name is Charles Eugene Kennimer, Jr.
17 Q. How are you presently employed, Mr. Kennimer?
18 A. I'm disabled right now, sir.
19 Q. How did the doctor's appointment go?
20 A. Very good, thank you.
21 Q. Mr. Kennimer, you and I met a couple of days ago in your
22 home. Is that correct?
23 A. Yes, sir.
24 Q. Had a pleasant conversation --
25 A. Yes, sir.

1 Q. -- about the case? I would like to go over, basically,
2 the same matters that we discussed when you invited me in
3 your home. First of all, let's talk about your employment
4 background.
5 A. Okay.
6 Q. You were in the military. Is that correct?
7 A. Yes, sir.
8 Q. What did you do in the military?
9 A. I was -- My main job was military intelligence. I did
10 several jobs, roughly about seven jobs, sir.
11 Q. You weren't a spy though?
12 A. No, sir.
13 Q. What type of jobs?
14 A. I worked with cryptology equipment, high level
15 classification equipment. I did calibrations, several other
16 technical jobs that I can't really go into detail with.
17 Q. But they were mechanical rather than investigatory in
18 nature?
19 A. Right.
20 Q. After you left the military, you were employed at the
21 Sheriff's Department in Sierra Blanca. Is that correct?
22 A. Yes, sir. About three years after. Yes, sir.
23 Q. And what did you do in the Sheriff's Department at
24 Sierra Blanca?
25 A. I was a sheriff's supervisor, sir.

1 Q. And explain what your responsibilities were.
2 A. At the time my responsibilities were -- I had about six
3 to seven people that were underneath. I was a sergeant at
4 the time. I was a booking supervisor. I received inmates,
5 federal inmates, INS, U.S. Marshals transfers, state and
6 local inmates.
7 Q. You're a corrections officer, basically?
8 A. Yes, sir.
9 Q. And you had men under you, men that you supervised?
10 A. Yes, sir.
11 Q. And you received some training to do that job. Is that
12 correct?
13 A. Yes, sir.
14 Q. And one of the things that you were trained in is
15 writing up incident reports. Is that correct?
16 A. Yes, sir.
17 Q. Disciplinary reports?
18 A. Yes, sir.
19 Q. And you were trained that those reports had to be
20 complete and accurate.
21 A. Yes, sir.
22 Q. Is that correct? Because they might be used in a
23 disciplinary proceeding or even in a court proceeding?
24 A. Yes, sir.
25 Q. And do you think you were a good report writer?

1 A. Fairly good, sir.
2 Q. And, in fact, you also had the responsibility of
3 reviewing the reports that other officers wrote also, didn't
4 you?
5 A. Yes, sir.
6 Q. In your training as a corrections officer, again, were
7 you trained not to talk with the inmates about their cases?
8 A. Yes, sir. That's kind of a written and unwritten no no.
9 You never do that.
10 Q. That's because it can get them upset. Right?
11 A. Yes, sir. Upset plus it can put yourself -- it's
12 information that's used sometimes and don't want to.
13 Q. As a corrections officer, you also received some
14 training in what's called the *Miranda* rule. Is that
15 correct?
16 A. Yes, sir.
17 Q. All right. And your understanding is that if you're a
18 corrections officer and you're wearing the uniform, that
19 you're in the same position as a police officer, as far as
20 that rule is concerned. Right?
21 A. Yes, sir.
22 Q. So, therefore, if you start to question an inmate about
23 his case, you would have to give the *Miranda* warnings before
24 they could be used in court is your understanding, right?
25 A. Yes, sir.

1 Q. But you weren't supposed to talk to the inmates about
2 the cases, so that really shouldn't be a problem.
3 A. Right.
4 Q. Now, the job that you -- how long were you with the
5 Sheriff's Department there?
6 A. In Hudspeth County?
7 Q. Yeah.
8 A. About eight years, sir.
9 Q. That's not something that you're likely to forget, is
10 it?
11 A. No, sir.
12 Q. Is it a pretty memorable experience? You did some
13 things there that you won't forget. Right?
14 A. Yes, sir.
15     MR. LOSCH: One moment, please.
16     THE COURT: Yes, sir.
17     MR. LOSCH: May I approach the witness?
18     THE COURT: You may.
19 BY MR. LOSCH:
20 Q. You testified at Michael Dean Gonzales's trial. Is that
21 correct?
22 A. Yes, sir.
23 Q. Do you recall giving the following testimony: Question:
24 "Were you employed by the Midland County Sheriff's
25 Department at any time while Michael Dean Gonzales was in

1 custody? Replay: "Here or -- I'm not sure what you're
2 trying to say. Well, have you been employed by the
3 Sheriff's Office here in Odessa or any place else?
4 Response: Just Midland."
5     I'll show you a copy of the testimony to refresh
6 your recollection.
7 A. Yes.
8 Q. And, Mr. Kennimer, that testimony was not accurate, was
9 it?
10 A. The way I understood it, yes, it was.
11 Q. Well, is it -- Was it true or false that you worked for
12 a sheriff's department somewhere other than Midland?
13 A. Well, the way I understand the question is at the time
14 of his incarceration. At the time of his incarceration --
15 Period, incarceration, are you trying to say --
16     MR. LOSCH: Let me approach the witness again,
17 please.
18     THE COURT: Okay. Certainly.
19 BY MR. LOSCH:
20 Q. Question: "Well, have you been employed by the
21 Sheriff's Office here in Odessa or any place else?"
22 A. All right.
23 Q. Answer: "Just Midland". Your testimony was not
24 accurate.
25 A. In that respect, no.

1 Q. You made a mistake. You weren't trying to lie to
2 anybody?
3 A. No, sir.
4 Q. Why did you leave the employment in the Sheriff's Office
5 in Sierra Blanca?
6 A. I felt personally that I wasn't getting anywhere as far
7 as advanced training, higher training. I was kind of like
8 stuck in one rut and wasn't getting nowhere and I wanted to
9 advance my training.
10 Q. You wanted a promotion, in other words.
11 A. Not necessarily promotion. But higher training.
12 Instead of being like on, say, step level one, I wanted to
13 get something higher, more training, more knowledge.
14 Q. Did you also want a different position?
15 A. Not necessarily position, just the training.
16 Q. Training to do what?
17 A. Just different training. There's -- there's different
18 training that you go through. We weren't receiving any
19 training in Hudspeth County itself.
20 Q. Yes.
21 A. Just the basic training, you know, that you initially go
22 through.
23 Q. Isn't it a fact that when we were in your house that you
24 told me that one of the reasons that you left is you wanted
25 a promotion and you felt you weren't going to get one

1 because they only gave out promotions to people that they
2 were friendly with and had some connections? Wasn't that
3 one of the reasons that you left?
4 A. That was a -- It wasn't per se for promotion. You were
5 asking me if I wanted to go into like the law enforcement --
6 Q. That was a separate question. It's all about -- the
7 reason -- Didn't you tell me when we talked that one of the
8 reasons that you left the Sheriff's Department in Sierra
9 Blanca is you hoped to advance and you felt you weren't
10 going to get a promotion because in that particular place
11 the people who got promotions were people who were connected
12 in some way?
13 A. Yes, sir.
14 Q. Thank you. And, in fact, you did apply for a job in law
15 enforcement. Right?
16 A. Yes, sir.
17 Q. And where was that?
18 A. I came here to Odessa. At the time the Odessa Police
19 Department had -- they were subcontracted to GRW
20 Corporation, corrections.
21 Q. No, prior to that, didn't you apply for a job in law
22 enforcement. Not as a corrections officer.
23 A. I was thinking of going into Immigration.
24 Q. Didn't you tell me when we talked in your house that you
25 actually filed an application for a job to work in law

1 enforcement as a peace officer and that your application was
2 denied?
3 A. No, sir. I didn't say that part. I said that I had
4 applied one for INS and I had gone -- I was going through
5 the process and I had -- I myself had withdrawn the
6 application.
7 Q. So, you did -- You never told me that you filed an
8 application to work in law enforcement and that application
9 was denied. You never said that to me?
10 A. Not that I recall, sir.
11 Q. But you may have said it.
12 A. If I did, I don't recall. Or maybe --
13 Q. That never happened?
14 A. You might have misunderstood what I was saying.
15 Q. You never filed an application anywhere other than GRW
16 to be a law enforcement officer. Is that your testimony?
17 A. Yes, sir.
18 Q. Now, you said that you did start the process of applying
19 for a job in INS?
20 A. Yes, sir.
21 Q. How did the process start?
22 A. Basically, it was -- I had a lot of friends that were
23 Border Patrol agents in the town I grew up in and when I had
24 got out of the military I had gone over there and I was
25 thinking maybe I could get into the INS.

1 Q. You actually started -- you filled out an application?
2 A. I had filled it out. I never went through and filed it
3 with INS.
4 Q. Why didn't you do that?
5 A. I had a lot of relatives that were -- were Mexican
6 residents and I just didn't feel right. It wasn't me.
7 Q. Well, isn't it a fact that you were concerned that if
8 you took that position that some relatives would pressure
9 you to do favors for them?
10 A. Yes, sir. That is possible.
11 Q. And that was the major reason that you decided not to
12 become an INS officer. Is that correct?
13 A. Yes, sir.
14 Q. Now, when you came to work as a corrections officer here
15 in -- for GRW here in Odessa, isn't it true that the job
16 that you had, basically, you were baby sitters for the
17 inmates?
18 A. Basically, that's all -- it's a glorified position, yes,
19 sir.
20 Q. And for somebody who had worked for ten years in the
21 military intelligence doing classified, complicated work,
22 somebody who had for several years been a supervising
23 correction officer, that was something of a come-down for
24 you to be a baby-sitter for the inmates. Right?
25 A. Yes, sir.

1 Q. And you hoped some day, maybe still hope, that you would
2 find -- I don't mean to insult you at all, but you hoped and
3 still hope that you might find better employment that was
4 more comparable to your capabilities?
5 A. Yes, sir.
6 Q. You feel you would have been a good law enforcement
7 officer?
8 A. Yes, sir.
9 Q. And -- Okay. Now, you are a member of a church. Is
10 that correct?
11 A. Yes, sir.
12 Q. And were the deceased in this case, the Aguirres, a
13 member of that church?
14 A. I didn't know it at the time, but, yes, they were.
15 Q. You didn't know it at the time?
16 A. I didn't know who they were. I didn't find out until
17 after the incident happened.
18 Q. After the incident happened.
19 A. Yes, sir.
20 Q. But you learned that well before the trial?
21 A. Yes, sir.
22 Q. People who knew them in the church were very upset about
23 what happened, naturally.
24 A. Yes, sir.
25 Q. And you knew some of those people who were upset?

1 A. They -- The church gossiped, yeah. They made comments.
2 Q. Now, you have a nephew named Joel. Is that correct?
3 A. Joel Favela.
4 Q. And Joel is -- You're his godfather?
5 A. Yes, sir.
6 Q. And you tried to be an active godfather, right?
7 A. Yes, sir.
8 Q. Teach Joel how to do the right thing and, you know, get
9 by in life?
10 A. Yes, sir.
11 Q. Has Joel done that?
12 A. Not -- not even close to it.
13 Q. All right. And Joel, to your knowledge, had some
14 contact with Michael Dean Gonzalez. Is that correct?
15 A. If he had contact, I don't know. He used to hang around
16 with some of his other cousins and stuff so I don't know if
17 he actually had contact with him.
18 Q. Do you believe that he did?
19 A. I have no idea. I can't say "yes" or "no".
20 Q. Isn't it a fact you told me when we were in your house
21 that you believed that they had some contact with each
22 other, even though you didn't have personal knowledge of it?
23 A. I believe they did because Joel was involved with local
24 gangs in there.
25 Q. And that was a bad influence on Joel, wasn't it?

1  A. It didn't help him.
2  Q. Got him into some trouble?
3  A. It got him in a lot of trouble.
4  Q. He's in prison right now. Right?
5  A. Yes, sir.
6  Q. Now, you are related to Michael Dean Gonzales. Is that
7  correct?
8  A. Yes, sir.
9  Q. Okay. And prior to his arrest in this case, you hadn't
10 seen him or spoken to him since he'd been -- Well, I guess
11 you couldn't have spoken to him. You hadn't seen him since
12 he was in diapers?
13 A. Yes, sir.
14 Q. You didn't even know what he looked like?
15 A. No, sir, I sure didn't.
16 Q. And when you, of course, when this murder happened,
17 there were stories about it in the newspapers and
18 Mr. Gonzales's name was mentioned in those stories. You
19 didn't know when you read those stories that was the little
20 guy you had seen in diapers, did you?
21 A. No, sir, I sure didn't.
22 Q. All right. Now, --
23    MR. LOSCH: One moment, please.
24 BY MR. LOSCH:
25 Q. I want to go over with you what happened on the date of

1  Michael Dean's arrest. And we discussed this at your house.
2  Is that correct?
3  A. Yes, sir.
4  Q. Isn't it a fact that on the first time that you saw
5  Michael Dean Gonzales on the day that he was arrested, you
6  were stationed in your usual position where you should have
7  been in the detention center of the Odessa Police Department
8  on the first floor?
9  A. Yes, sir.
10 Q. Now, to inform the Court, at that time the detectives
11 had an interview room or interrogation room on the second
12 floor. Is that correct?
13 A. From my knowledge, yes, sir.
14 Q. And you couldn't see it from your position on the first
15 floor?
16 A. No, sir.
17 Q. And the first time you saw Michael Dean Gonzales, he was
18 brought in by Detective Robertson and a Texas Ranger to the
19 detention center where you were stationed. Is that correct?
20 A. Yes, sir.
21 Q. And after -- They booked him in. Is that correct?
22 A. I'm not too sure if they had already booked him in or
23 not. I'm not too familiar.
24 Q. There did come a point though where Detective Robertson
25 turned him over to you and said that he needed to make a

1  telephone call. Is that correct?
2  A. Yes, sir.
3  Q. And Mr. Gonzales was taken to the telephone. Is that
4  correct?
5  A. He was taken to -- Excuse me, to the telephone a couple
6  of minutes afterwards, yes, sir.
7  Q. In this area where the telephone call was being made, it
8  was a security area where there were videotapes and audio
9  tapes. Is that correct?
10 A. Yes, sir.
11 Q. So, that if people were speaking audibly, what they said
12 in a conversational tone like we're talking now without the
13 microphones would be picked up on that audio tape?
14 A. Yes, sir. They should have.
15 Q. All right. And Michael Dean was making a telephone
16 call. Is that correct? He had the telephone in his hand?
17 A. At what particular time?
18 Q. At any point. Did he --
19 A. After -- a couple of minutes after they told me to take
20 him over there.
21 Q. He had a telephone in his hand?
22 A. Yes, sir.
23 Q. And you told me when we spoke that it was Michael Dean
24 who spoke to you first. Is that correct?
25 A. Yes, sir.

1  Q. You didn't say anything to him before he spoke to you?
2  A. Not that I can recall.
3  Q. Well, you didn't even say that when we spoke you said he
4  didn't say anything to you.
5  A. The best I can recall.
6  Q. You didn't say anything to him. In fact, you weren't
7  supposed to discuss cases with the inmates.
8  A. Right.
9  Q. You knew that at that time, of course?
10 A. Yes, sir.
11 Q. But he spoke first.
12 A. Yes, sir.
13 Q. You didn't speak first. Now, when he walked in, since
14 you hadn't seen him since he was in diapers and he -- he's
15 changed a bit since he was in diapers, hasn't he?
16 A. Yes, sir.
17 Q. He didn't have all those tattoos. He didn't look like
18 that.
19 A. Yes, sir.
20 Q. You didn't recognize him, did you, as a relative?
21 A. No, sir.
22 Q. And he didn't say, "Hi, uncle," or whatever?
23 A. No, sir.
24 Q. And you told me yesterday that the -- when Michael Dean
25 spoke to you, that the first thing that he said to you was

1  in the nature of a confession. Is that correct?
2  A. Basically -- Yes, sir.
3  Q. Now, it seems to me that this description or events that
4  you're describing is consistent with your training about the
5  Miranda rule and the policy of not talking to inmates about
6  their cases because if you had initiated a discussion with
7  him about his case at that point and didn't give him any --
8  You didn't give him any Miranda warnings, did you?
9  A. No, sir.
10 Q. And if you had started talking to him about his case
11 without giving the Miranda warnings and he had confessed to
12 you, that would have been useless?
13 A. Yes, sir.
14 Q. But that didn't happen?
15 A. No, sir.
16 Q. And if you had started talking to him about his case,
17 that would have violated the policy of the jail of not
18 talking to inmates about their cases and might have gotten
19 him upset and gotten you in trouble.
20 A. Right.
21 Q. Now, let me give you an example to make sure I
22 understand how this policy and your understanding the
23 Miranda rule works. Let's say an inmate were brought in
24 after an interrogation. All right? And it looked to you
25 that the inmate was angry, you didn't know what happened,

1  but it looked like he was angry, and you said to the
2  inmate -- he didn't say a word to you now, right? And you
3  said to the inmate, "Boy, I don't know what you said, but
4  you must have got those cops really upset" and then he
5  confessed to you, that would be a violation of the Miranda
6  rule, because you would have initiated the conversation
7  about the case. Is that correct?
8  A. Not necessarily, sir, because it's not directly
9  saying -- I didn't come out and say, "What did you do?"
10 There's different ways of -- it's just like if you have a
11 baby that's crying, you know, sometimes you play with them,
12 you do different effects to calm them down.
13 Q. Isn't it a fact that you told me in your house in front
14 of -- By the way, this woman here and this gentleman here
15 were with me at the time?
16 A. Right.
17 Q. Is that correct?
18 A. Yes, sir.
19 Q. And you saw they were taking notes?
20 A. Yes, sir.
21 Q. Try to recall, because no one is perfect, you made one
22 mistake earlier today --
23 A. Okay.
24 Q. -- and you may be making another one now. Isn't it a
25 fact that when I asked you at your house, gave you the same

1  set up, you see that the inmate is upset, you think he's
2  been interrogated but you don't know about that, and you say
3  to the inmate, "I don't know what you said to these
4  officers, but they are really upset", that that would be --
5  and he came back and confessed, that that would be a
6  violation of the Miranda rule because you would be
7  initiating the conversation. Didn't you tell me that in
8  your house?
9  A. Not in those exact words, sir. What I said if you
10 directly ask him about the case, that would be an violation.
11 But when you're trying to calm somebody down -- like I said,
12 if he's upset -- I'm trying to let him know, "Hey, look, I
13 don't care what you did. I really don't care. But what I'm
14 trying to let you know is, you know, I understand you're
15 upset. Calm down, you know, I'm not" --
16 Q. Okay. Now, that's not what happened here, in any event,
17 because he spoke first.
18 A. Right.
19 Q. Let's talk about your understanding of the rule talking
20 about the case.
21 A. Yes.
22 Q. All right? Now, if I believe that the man has been
23 interrogated by police officers, you don't know, but that's
24 what you think, and you believe that he's upset because of
25 something that happened during the interrogation, you don't

1  know that, but that's your opinion, and you say, "I don't
2  know what you said, but you really upset those cops"; don't
3  you think you're talking about the interrogation that just
4  happened? You.
5  A. You might be talking about it actually, not asking him
6  what's involved or what questions were asked.
7  Q. I understand that. But the subject you're bringing up
8  is the interrogation.
9  A. Right.
10 Q. "I don't know what you said to the officers, but you got
11 them upset". Now, don't you think that that is talking
12 about the man's case? Isn't the interrogation part of the
13 case?
14 A. Yes, sir. But it's not directly asking him the
15 involvement.
16 Q. I understand that. But now we're not talking about the
17 Miranda rule. Right? We're talking about the jail policy
18 of not upsetting the inmates and not discussing their cases
19 with them.
20 A. Yes, sir, you're trying to diffuse the situation --
21 Q. The idea is not to upset them, right?
22 A. Right.
23 Q. So, you understand that if you start talking to the
24 inmate about the interrogation, that that is bringing up the
25 subject of his case, whether or not it violates the Miranda

1 rule, you're talking about the case.
2 A. Right.
3 Q. Now --
4 THE COURT: Can I, just to make sure I understand,
5 but you're saying you never said that.
6 THE WITNESS: I never initiated any conversation,
7 no, sir.
8 THE COURT: So, you -- You never said, "I don't
9 know what you told those officers" --
10 MR. LOSCH: Your Honor, --
11 THE COURT: Yes, sir.
12 MR. LOSCH: May I respectfully request at this
13 point I be allowed to continue with the witness and the
14 Court --
15 THE COURT: Well, I just need to see if I
16 understand. I --
17 MR. LOSCH: Okay.
18 THE COURT: You may be getting there in a round
19 about way.
20 MR. LOSCH: I think I'm going where the Court --
21 Yeah. I think I'm going where the Court wants to know and I
22 do have a way of -- Let me rephrase the objection. What I'm
23 trying to --
24 THE COURT: Go ahead.
25 MR. LOSCH: This really is important. What I'm

1 trying to demonstrate to the Court is had the attorneys made
2 use of the information that I have or had at the trial,
3 questions that you may ask would not demonstrate would have
4 happened at the trial and it may change the course of my
5 interaction with the witness.
6 THE COURT: Okay. You're saying -- Let me make
7 sure I understand the record. I understand in the record --
8 MR. LOSCH: Your Honor, could we discuss this
9 outside of the presence of the witness if we're going to
10 talk about what's in the trial testimony?
11 THE COURT: In the -- That's fine. You -- Come
12 over here a minute.
13 (Bench.)
14 THE COURT: My problem is this witness was on the
15 witness stand. As I understand it, maybe I've got this
16 wrong, there is a -- a reported statement in the records,
17 the police records, that he said, I don't know what you
18 said, but he said that --
19 MR. LOSCH: That's the trial testimony and I'm
20 trying to show how he was impeached at the trial. If you
21 alert him to the inconsistencies to what he's saying here
22 and what he said at the trial, it would interfere with my
23 effort to show how he could have been impeached --
24 MR. DUNCAN: Your Honor, if he's going to pretend
25 he's the defense attorney trying to impeach the witness,

1 could I pretend I'm the prosecutor and act the way I would
2 if I were in trial?
3 THE COURT: Hold on a minute, guys. Is there any
4 statement, and this -- maybe I've got the trial testimony
5 confused with the records, that were in the police
6 reports --
7 MR. LOSCH: They're inconsistent.
8 THE COURT: Okay.
9 MR. LOSCH: The trial testimony says that -- the
10 trial testimony says Kennimer initiated the conversation.
11 The statement says that he didn't.
12 THE COURT: There's nothing before the trial
13 testimony --
14 MR. LOSCH: Not testimony. There's the written
15 statement of Kennimer that says he did not initiate the
16 trial testimony.
17 THE COURT: Okay.
18 MR. LOSCH: I'm trying to develop his reactions to
19 the inconsistencies so I don't want to educate him about
20 the -- I will cover it fairly, but I don't want to spill the
21 beans.
22 THE COURT: Okay. Well, I'll let you go forward.
23 At least it's helpful to me to understand that in the trial
24 he testified that he initiated the conversation.
25 MR. LOSCH: Correct.

1 THE COURT: But there were no police reports or any
2 other documents before trial that indicated that.
3 MR. LOSCH: His own statement -- That's correct.
4 His written statement was inconsistent with that.
5 THE COURT: Okay. I understand. How much time do
6 you think you're going to need to do this?
7 MR. LOSCH: We'll be done by lunch.
8 THE COURT: Okay. Good. Okay. Let's take a --
9 We'll go back on the record.
10 (Open court.)
11 THE COURT: Okay. Now you may proceed.
12 BY MR. LOSCH:
13 Q. We were talking about the policy of not discussing the
14 cases with inmates to avoid upsetting them.
15 A. Right.
16 Q. And you acknowledged that if an officer started
17 discussing in any way talking about what the inmate said or
18 didn't say during an interrogation, that would be bringing
19 up the case.
20 Now, let's suppose that you -- You believe that the
21 inmate is upset about the interrogation. Don't you think
22 that -- Well, isn't it true that if he's already upset about
23 the interrogation and he hasn't said a word to you about it,
24 that if you initiated a conversation bringing up that
25 subject that's upset him that it could get him even more

1 upset?
2 A. That's possible. But the problem is, when these inmates
3 come in, I call them inmate, they're not inmates until
4 they're booked in. When they come in, they're already upset
5 for whatever the situation --
6 Q. They're all upset?
7 A. 90% of them or 99% of them are all set because they got
8 arrested or whatever. We're not there to determine whether
9 they're innocent or guilty. We're just to trying calm it
10 down. It's like add a little bit of water to the fire, try
11 to calm it down, so it's not so hot, because we're the ones,
12 like you said, we are the ones that have to baby-sit them,
13 so to speak.
14 Q. But if you think the inmate is upset about something and
15 he's isn't talking about it, isn't there a risk you're going
16 to get him even more upset by initiating the conversation
17 about the thing that upset him?
18 A. It's possible.
19 Q. So, you wouldn't do that because the jail policy is not
20 to put a match on the fire. Right?
21 A. Exactly.
22 Q. And you followed the policy in this case?
23 A. Yes.
24 Q. You didn't initiate a conversation of any sort with
25 Mr. Gonzales?

1 A. I did not.
2 Q. And you followed the Miranda rule. You certainly didn't
3 start talking about the case to him.
4 A. Right.
5 Q. Now, --
6  MR. LOSCH: One moment.
7 BY MR. DUNCAN:
8 Q. Going back to what happened that day, after Mr. Gonzales
9 made a statement to you, and we'll come back to the
10 statement, but for -- I want to cover something else. After
11 he made the statement to you, you very soon thereafter put
12 him back in a cell, right?
13 A. After his phone call, yes, sir.
14 Q. After his phone call was completed. And that was a
15 matter of minutes?
16 A. Yes, sir.
17 Q. And you went back to your desk. Correct?
18 A. I went back to the front booking station.
19 Q. Front booking station. And within ten minutes you were
20 told that Detective Robertson wanted to see you. Is that
21 correct?
22 A. Within about ten minutes after I put him up, yes, sir.
23 Q. This is about ten minutes after he made that
24 statement --
25 A. Yes, sir.

1 Q. -- to you. And did you -- you went upstairs to see
2 Detective Robertson. Right?
3 A. Yes, sir.
4 Q. And Mr. Gonzales at that point, of course, was in his
5 cell?
6 A. Yes, sir.
7  MR. LOSCH: May I approach the witness?
8  THE COURT: Yes, sir.
9 BY MR. LOSCH:
10 Q. Now, when you went upstairs to see Detective Robertson,
11 you had a conversation with him about the statement that
12 Mr. Gonzales made. Is that correct?
13 A. Yes, sir.
14 Q. And one of the things that happened is that Detective
15 Robertson asked you to make a statement yourself. Right?
16 A. Yes, sir.
17 Q. A written statement that accurately described exactly
18 what happened.
19 A. Yes, sir.
20 Q. And had you to sign that. Right?
21 A. Yes, sir.
22 Q. And from your training as a corrections officer, this is
23 similar to one of those incident reports that you had to
24 write up?
25 A. Basically.

1 Q. All right. And you were trained about the accuracy of
2 those reports?
3 A. Yes, sir.
4 Q. All right. And this one, because it's -- it's something
5 about a confession of an inmate, it's especially important
6 to be accurate.
7 A. Right.
8 Q. And you did your very best to be as accurate as you
9 could.
10 A. Yes, sir.
11 Q. Right? By the way, when you were working as a
12 corrections officer in the previous job --
13 A. Yes?
14 Q. -- from time to time law enforcement asked you to
15 cooperate with them by observing who came to visit inmates
16 and such, right?
17 A. Yes, sir.
18 Q. And you felt it was part of your job to assist law
19 enforcement?
20 A. Yes, sir.
21 Q. And you were anxious to do that well. Right?
22 A. Yes, sir.
23 Q. I'm going to show you a copy of the statement which is
24 already in evidence that you -- that Detective Robertson
25 asked you to make. And please review that.

1 A. (Reviewed by witness.) Okay.
2     THE COURT: All right. Now, let me just ask you:
3 This statement is typewritten. Is that correct?
4     MR. LOSCH: May I approach?
5     THE COURT: Let me see it.
6     THE WITNESS: Yes, sir. Officer Snow did it on
7 computer or whatever.
8     THE COURT: Okay. Did you dictate it to him?
9     THE WITNESS: I was just -- just like I am --
10     THE COURT: You're talking --
11     THE WITNESS: He would ask me questions and I --
12     THE COURT: And he typed the report up as he talked
13 to you?
14     THE WITNESS: Yes, sir.
15     THE COURT: Okay. Thank you.
16 BY MR. LOSCH:
17 Q. Of course, you read it over though before you signed it
18 to make sure it was accurate?
19 A. On that particular one I don't know if I did or not.
20 It's been so long.
21 Q. That's your signature --
22 A. That's my signature, yes, sir.
23 Q. And you read it before you signed it to make sure it was
24 accurate. That's part of your training?
25 A. Yes, sir. I signed a bunch of papers.

1 Q. But you read this particular statement over before you
2 signed it to make sure it was accurate. You didn't want him
3 putting any mistakes in there.
4 A. Right.
5 Q. And you're trained how to read these reports for
6 accuracy, right? Now, you told me when we were at your
7 house the other day --
8 A. Yes?
9 Q. -- that about two weeks after you signed this
10 statement, you learned that you were related to Michael Dean
11 Gonzales. Do you remember telling me that?
12 A. Yes, sir.
13 Q. This statement says that on the day that he was
14 arrested, he made this confession, you knew that you were
15 related to him.
16 A. No, sir. It just says I talked to Joel. I didn't -- I
17 didn't get no answer from Joel --
18     MR. LOSCH: May I approach the witness?
19     THE COURT: You may.
20 BY MR. LOSCH:
21 Q. Please read the statement again and tell me whether in
22 your opinion that says that you knew that day that you were
23 related to him or believed that you were.
24 A. (Reading.) Okay.
25 Q. Okay. It does. It indicates that you believe that you

1 were related to Michael Dean Gonzales. Now, in this
2 statement -- is that correct?
3 A. Yes, sir.
4 Q. In the statement it says that this same day that Michael
5 Dean Gonzales made this statement to you that you call a
6 confession, that you called your nephew Joel --
7 A. Yes.
8 Q. -- to confirm whether or not you were related to him.
9 A. Yes.
10 Q. And that is inaccurate, because you didn't call your
11 nephew Joel that day. Is that true?
12 A. No, sir, I didn't. We didn't have access to call out on
13 the phones at the jail.
14 Q. And you didn't even know you were related to him so you
15 couldn't have made a call for that purpose.
16 A. Right.
17 Q. This is completely inaccurate. That part of it.
18 A. That part is, sir.
19 Q. So, you've made two mistakes so far. A mistake in the
20 report and a mistake in your testimony. Is that correct?
21 A. I didn't write the report. Like I say, it was done on
22 computer.
23 Q. Well, Detective Robertson certainly had no way of
24 believing or knowing that you were related to Michael Dean
25 Gonzales, would he?

1 A. No.
2 Q. He wouldn't have put that in there. It had to come from
3 you, right?
4 A. Right.
5 Q. But you actually didn't make a statement like that --
6 A. Not --
7 Q. At the time you didn't even recognize the man. You
8 hadn't since he was diapers, right?
9 A. I didn't even know what his name was until I went back
10 to the front office.
11 Q. Why did you make up this story and tell Detective
12 Robertson you thought he confessed to you because you
13 thought you were related to him when you didn't even know
14 that you were related to him?
15 A. I didn't make up no story, sir.
16 Q. Well, it's not true.
17 A. That last portion over there about calling my nephew
18 Joel is not true.
19 Q. There's more to it than that. You say in your statement
20 here that it was your belief that the reason he made this
21 confession to you is because you were related. That's what
22 you say here in your statement.
23 A. No, sir. That's not what it says there.
24     MR. LOSCH: Let me approach the witness again?
25     THE COURT: You may do so.

BY MR. LOSCH:
Q. Please read the statement again and tell me whether that says that you believe the reason that he confessed to you is that he's related to you.
A. (Reading.) It doesn't say anything about what you're saying. If I -- No, sir.
    THE COURT: Well, could you read out loud what your -- what passage you're referring to, Mr. Losch.
    MR. LOSCH: Well, it -- it just refers to the fact, it says, "Michael Dean Gonzales is my third cousin on my mother's side and he knows I'm his cousin". Then he goes on to talk about the confession.
BY MR. LOSCH:
Q. Why else are you putting that in there if you're not trying the tell him that's --
A. I didn't tell him that because -- Like I said, I didn't know who he was until about two weeks after it happened.
Q. Right. So, you don't know how that got in there?
A. I don't recall that. It's been a while back, sir.
Q. Now, do you think that Detective Robertson went out and did an investigation about whether you were related to Michael Dean Gonzales?
A. I have no idea.
Q. He didn't even -- All right. Now, --
    THE COURT: So, just -- I don't have the statement

in front of me. The statement, there's no wording in the statement that Mr. Kennimer says, "I think the reason Gonzales confessed to me" --
    MR. LOSCH: It's an implication.
    THE COURT: It's an implication. But it's not stated --
    MR. LOSCH: Correct.
    THE COURT: -- specifically.
    MR. LOSCH: And the statement will speak for itself, of course.
    THE COURT: Okay.
BY MR. LOSCH:
Q. Now, you testified earlier that it would be improper for you to start questioning a witness about the case -- an inmate about the case.
A. Right.
Q. And, yet, you say here in this statement that after Michael Dean Gonzales made this confession, "I then told him, 'I don't know what you're talking about.' He replied 'on the murder of the old man and the old lady.' I told him I didn't know anything about it. I'm kind of new around here. I just played it up." Isn't it a fact that what that means, "I just played it up", is you were trying to deceive Michael Gonzales and encourage him to make more statements to you about the case?

A. No, sir. That's the way you're interpreting it. What I said there to Detective Snow was after he made the statement I made it -- I was trying to calm him down because he was upset. Like I explained to you earlier --
Q. Now, explain to me what "I just played it out" means.
A. That was just a word -- just a figure of speech. What I did -- I let -- He said what he said. I played it off just like, it went in one ear --
Q. You played it up?
A. That's just a figure -- the way it's written down. But I didn't add fuel to the fire. No. What I was doing was calming him how. I was letting him know, I didn't care what he was here for -- I was, hey, I'm new around here. I don't know what's going on and I don't want to know what's going on. That's what I'm saying.
Q. And isn't true that you were playing it up to try to get him to tell you more?
A. No, sir. That's what you're saying.
Q. And it says in here the next thing that you did is that you called your nephew Joel, but you didn't do that?
A. No, sir, I sure didn't.
Q. Now, did you ever tell Detective Robertson that you believe that the reason that Michael Dean confessed is because he's related to you? Did you ever tell him that orally?

A. No, sir.
Q. If Detective Robertson wrote that in his report and then testified that his report was accurate, would he be lying?
A. Yes, he would.
    MR. LOSCH: May I approach the witness?
    THE COURT: You may.
    MR. LOSCH: This is a copy of Detective Robertson's report of his conversation with Mr. Kennimer, which is already in evidence.
    MR. DUNCAN: Your Honor, may I take a look at the --
    MR. LOSCH: Certainly.
    THE COURT: Certainly.
    (Off-the-record discussion between counsel.)
    THE COURT: By the way, we've been going about an hour. I normally take short breaks. We'll take about a seven or eight minute break and then we'll come back at eleven thirty.
    MR. LOSCH: Your Honor, may you instruct the witness not to talk to anybody during the break?
    THE COURT: Yes. That would be appropriate, if you would, Mr. Kennimer.
    THE WITNESS: Yes, sir.
    (Short recess.)
    THE COURT: Okay. Thank you so much. Now, if --

1 have counsel had an opportunity to look at the document and
2 you're ready to proceed, Mr. Losch?
3     MR. LOSCH: I'm going the approach the witness
4 again.
5     THE COURT: You may do so.
6 BY MR. LOSCH:
7 Q. Showing you part of -- This is page 165 of Detective
8 Robertson's report, which is in the record of the Motion for
9 New Trial hearing. And this report, written by Detective
10 Robertson, says Charles Kennimer told him he was his cousin
11 on his mother's side. Charles Kennimer believes this is why
12 he told him that he committed the murders. Is that a lie?
13 A. That's his opinion, sir, not mine. That's not my
14 comment.
15 Q. Where do you think he got that information from to form
16 that opinion?
17 A. I don't know, sir. From my understanding, when they
18 arrested Michael, this had already been like two weeks or
19 more, I'm sure they had time to investigate if he was
20 suspected. I don't know that's -- I don't know where he got
21 that from, sir.
22 Q. I understand. He's not talking about he could have
23 learned in his investigation. Had you ever spoken about the
24 Michael Dean Gonzales case with Detective Robertson prior to
25 the date of Mr. Gonzales's arrest?

Kennimer - Direct
Page 378

1 A. No, sir.
2 Q. So, there's no way before Detective Robertson spoke to
3 you about this confession that he could have known that you
4 had a belief that you thought that he confessed because he
5 was related to you? He couldn't have known that before they
6 brought Michael Dean in. Right?
7 A. No, sir.
8 Q. Well, again, what did you say to Detective Robertson
9 that made him believe that you thought that the reason that
10 he confessed is because he was related to you?
11 A. I didn't ever give him any idea to do that, sir. I
12 don't know why he wrote that down. Like I say, that's his
13 comment, not mine; not my remark or anything.
14 Q. In fact, according to your testimony, he couldn't have
15 possibly gotten that from you because on this day, when you
16 spoke with Detective Robertson, you didn't even know you
17 were related to the man. Right?
18 A. No, sir, I didn't.
19 Q. You found out two weeks later?
20 A. Roughly that --
21 Q. So he, he imagined all this out of somewhere, made a
22 huge mistake, put words in your mouth, right?
23 A. Like I say, that wasn't my comment, sir. I didn't make
24 that remark.
25 Q. Pretty dumb of him, wasn't it?

Kennimer - Direct
Page 379

1 A. No comment on that one, sir.
2 Q. Now, Mr. Gonzales made this statement to you, the
3 statement that you call a confession, in Spanish. Is that
4 correct?
5 A. Yes, sir.
6     MR. LOSCH: May I approach the witness?
7     THE COURT: Yes, sir.
8     MR. DUNCAN: I don't know that we have -- I mean --
9 Your Honor, could we approach the bench?
10     THE COURT: Okay.
11 (Bench.)
12     MR. DUNCAN: I don't want to tip off the witness
13 over here as to what Mr. Losch may have in mind, but --
14     THE COURT: What is --
15     MR. DUNCAN: Apparently, he's proposing to test the
16 witness by having him translate --
17     MR. LOSCH: Some statements.
18     MR. DUNCAN: Some statements in Spanish. But I
19 don't think we're prepared to do that kind of test here as
20 far as having a translator -- a certified translator
21 available to decide whether or not he's translating
22 correctly or --
23     MR. LOSCH: I have a witness -- I have someone on
24 my team who speaks Spanish who can testify.
25     THE COURT: Wait a minute. Let me ask. Does -- Do

Kennimer - Direct
Page 380

1 these statements in Spanish, are they from the record?
2     MR. LOSCH: One of them is a Spanish translation of
3 what he said Michael said. The other two are things that
4 were not said. They're similar.
5     MR. DUNCAN: What you're saying you've done then is
6 you've taken the English version in the report and
7 retranslated it back into Spanish?
8     MR. LOSCH: I want to see if it's correct from him.
9 He can tell me it's right or not right. If he says the
10 translation is wrong, he can do that. I just want to test
11 his ability --
12     THE COURT: Does he have the -- he has before him
13 the English version, right? In his report -- he has the
14 English version of what was said?
15     MR. LOSCH: Right. He knows the English version.
16     THE COURT: Well, I -- it may be unusual or
17 creative, one or the other. I'll see where you go on this.
18 It's -- Let me see. We may not -- we may strike all of
19 this --
20     MR. DUNCAN: This poses a particular difficulty in
21 me, Your Honor, in that I'm not prepared to cross-examine
22 the witness in Spanish.
23     MR. LOSCH: Neither are the defense attorneys.
24     MR. DUNCAN: Well, you know -- that's fine that
25 you're trying to put on a demonstration here about what they

00445

would have done at trial but this isn't really a good test for that.

THE COURT: Let me ask -- Gosh, I'm just so worried about time at this point, but do we have our court -- our court interpreter here?

LAW CLERK: Let me check, sir.

THE COURT: Ask Becky if she will find out. In the meantime, let's pull this back.

MR. LOSCH: I'll move on to other questions.

THE COURT: Okay. We're ready to move forward.

(Open court.)

BY MR. LOSCH:

Q. Now, earlier today with the knowledge you made a mistake in your testimony at the trial. Is that correct?

A. On which portion, sir?

Q. Whether you've been employed in the Sheriff's Department elsewhere?

A. Yes, sir.

Q. You've also testified to date several times that you didn't initiate a conversation with Mr. Gonzales.

A. Right.

Q. That's true?

A. Right.

Q. In fact, you also said the same thing in your written statement to Detective Robertson that you did not initiate

the conversation.

A. I did not initiate the conversation.

MR. LOSCH: Okay. May I approach the witness?

THE COURT: You may.

MR. LOSCH: I'll go back to the bench. I changed my mind. I'll go back to the podium.

THE COURT: Okay.

BY MR. LOSCH:

Q. Do you remember giving the following testimony at the trial. "Question: When Mr. Gonzales came out of that room, did you speak to Mr. Gonzales?" "Answer: Not in great detail. The only thing I asked him was -- Well, I didn't ask him. I made a little statement saying, 'Boy, you really got these officers upset. You know, I didn't know what you said'. It's been a while but exact words I'm not too sure." Do you recall giving that testimony?

A. Yes, sir. The reason I made that remark --

Q. I didn't ask the reason, sir. Do you recall giving the testimony?

A. Yes, I do.

Q. So, in fact, the testimony that you gave here today repeatedly that you did not speak first to Mr. Gonzales was false?

A. Not the way you're implying, sir.

Q. In fact --

A. I told you I didn't initiate the conversation as to why he was arrested.

Q. That was not the question. I asked you repeatedly here today whether you spoke first or he spoke first. You repeatedly testified that he spoke first. At the trial you testified that you spoke first. Which time were you lying?

A. I'm not lying, sir.

Q. Well, which time was true?

A. I'm defusing a hot situation trying the calm him down because he was upset, sir. You can't take it out of context.

Q. I'm not taking anything out of context. You've given two inconsistent versions. You've testified here today repeatedly that Michael Dean Gonzales made the first statement when he was standing there on the telephone and you didn't say a word to him before he spoke to you. You testified at the trial that you made the first statement. One of those has to be true -- Maybe they're both false. Are they both false?

A. No, sir, they're not.

Q. Which one is lie?

A. Neither them is a lie, sir.

Q. Which one is false?

A. Neither of them is false. What I'm trying the tell you, sir, I was trying to defuse the situation --

Q. I'm not asking for the explanation of why you --

A. All right.

Q. I just want no know, did you speak to him first or did he speak to you first? Who said the first words?

A. I was trying to calm him down --

Q. I'm not --

A. If I said --

MR. LOSCH: Your Honor, objection. Would you instruct the witness to answer the question?

THE COURT: Mr. Kennimer, I'm not for sure if you're focusing -- I understand you want no give an explanation, but before you give an explanation, focus on the question and the question is: Who spoke first, you or Mr. Gonzales. That's the question. Can you --

THE WITNESS: If it's written down, sir, that must have been it. It's been a while. Like I say, I really can't say -- if I started to say -- if I said something or he did or -- I'm going by my best recollection.

THE COURT: Okay. So, what -- what is your best recollection at this time?

THE WITNESS: If he's quoting what I said on the deal, yes, right offhand, I don't remember initiating the conversation, sir.

THE COURT: Okay. You don't remember initiating the conversation.

THE WITNESS: No, sir.

THE COURT: Okay. And so that's -- that's your testimony at this time?

THE WITNESS: Yes, sir.

THE COURT: Okay. Thank you. You may proceed.

BY MR. LOSCH:

Q. And, in fact, you've also testified here today that if you had initiated such a conversation with Mr. Gonzales, that that would have been improper for two reasons: Number one, if -- if he did that, it would have been a Miranda problem, because you would have started the conversation. And secondly, because you're talking here about talking to the officers a discussion about the case it would have violated the jail policy. So, you would have had those two problems if you started it.

A. Right.

Q. But you -- Even though you testified to the jury that you started it, you didn't start it because you're trained and you don't do those things. Right?

A. Not start to ask him questions of what he's there for. If I said anything to him, if I remember -- if I did, it was to calm him down because he was upset.

Q. I understand that. But you testified here today --
Look, according to your trial testimony, you said that the first --

THE COURT: Well, can I say, I -- what I think the record is, and I know -- I mean, these -- and I don't want to interrupt your conversation, but I think the record is that he does not recall talking to him first. If that is his testimony, then what he is testifying here today is inconsistent with what he testified to at time of trial. And we can keep talking about that, but I -- but I just think that's what the testimony is, that there is an inconsistency. It may -- Maybe it won't prove to be such at the end of this, but --

MR. LOSCH: Okay.

THE COURT: But that's what it seems to be at this time.

MR. LOSCH: I'll accept Your Honor's guidance on that point.

THE COURT: Okay.

MR. LOSCH: One moment.

THE COURT: Yes, sir.

BY MR. LOSCH:

Q. Now, Mr. Kennimer, as the Judge has pointed out, there is an inconsistency between your trial testimony on this point and what you're saying today. There is an inconsistency between your trial testimony about your prior employment in the Sheriff's Office and what you're saying today. So, according to what you're saying today, you made

at least two mistakes in testifying before the jury at the trial. Is that fair?

A. No, sir. I don't think that's fair. I might have misunderstood the question. As far as the employment, the way I understood the question was at the time of his incarceration. I wasn't, you know --

Q. But the answer was inaccurate, even if you misunderstood the question, --

A. Right. Right.

Q. You made a mistake.

A. Right.

Q. You've made two mistakes. Now, you're saying today that your best recollection is that Mr. Gonzales, who you did not know at all, was making a telephone call and you were just standing by keeping an eye on him doing your job. Right?

A. When he made the statement?

Q. No. No. When he made the telephone call.

A. Yes, sir. I was just standing there making sure he didn't violate security.

Q. And your present recollection is that you didn't initiate the conversation. Is it also fair to say that you didn't at that moment before he opened his mouth, you didn't expect him to talk to you at all?

A. No, sir, I sure didn't.

Q. All right. Did he shout or speak in a conversational

tone?

A. It was a low tone.

Q. A low tone. And according to your trial testimony, he said, "I did it," among other things?

A. Yes, sir.

Q. That was the extent of what he said about the crime. Right?

A. Yes, sir.

Q. That's all he said about the crime. Is that correct?

A. Yes, sir.

MR. LOSCH: May I approach the witness?

THE COURT: You may.

MR. LOSCH: This is the statement.

BY MR. LOSCH:

Q. Now, according to your report to Detective Robertson, which you've read very carefully to make sure that it had no mistakes in it, after he said, "I did it," you said, "I then told him, 'I don't know what you're talking about'. He replied, 'On the murder of the old man and the old lady'. That was an additional fact about the crime. Right? In addition to "I did it"?

A. I wouldn't say it's a fact, sir. It could have just -- if he didn't do it, he could have read it in the newspapers or something and might have --

Q. That's quite true.

00447

1  A. Like I said I don't know what --
2  Q. It is an additional detail, whether it's true or not, it
3  is an additional detail about the crime. Right?
4  A. Yes, sir.
5  Q. And, in fact, he never made that statement. He just
6  said, "I did it".
7  A. Just like it's wrote on there, sir. There was a lot of
8  other minor stuff that was said. Like I said, if he said I
9  am, crossed the t's and all that, dotted the i's, I don't
10 remember. It's been a while.
11 Q. Do you think the difference between "I did it" and --
12 you don't know what he's talking about. He hasn't explained
13 anything. "I did it". And "on the murder of the old man
14 and the old lady," that isn't a significant difference? "I
15 did it" could mean I robbed the candy store. Right?
16 A. It could be anything.
17 Q. Right. But I -- "on the murder of the old man and the
18 old lady," we're talking about the case. Big difference.
19 Right?
20 A. That was his comment, why he was -- like I said, I
21 didn't know why he was arrested, why he was brought in.
22 Q. Oh, now you're saying he did make additional statements
23 about the case.
24 A. Just as it's right there. Just as it's right there.
25 Q. That's not what you said a moment earlier. A moment

1  earlier you said the only statement he made was "I did it".
2  A. No, sir, you're taking things out of context. You're
3  trying to take one thing at a time.
4  Q. All right. All right. You think I'm taking things out
5  of context.
6  A. Like I said, I didn't remember --
7  Q. Okay.
8  A. -- if I said anything.
9  Q. Okay. Now, you made all these mistakes that we've
10 talked about despite of your training. Right? To be
11 accurate in recording these things. You made these
12 mistakes. Correct?
13 A. If you say so, sir.
14 Q. Well, I'm asking you.
15 A. Like I said, I don't have a photogenic mind. I can't
16 recall everything.
17     MR. DUNCAN: I object, Your Honor. This is more of
18 a statement than a question and it's argumentative --
19     MR. LOSCH: Withdraw the question. Withdraw the
20 question.
21     THE COURT: All right. Let's start all over again.
22 BY MR. LOSCH:
23 Q. Mr. Gonzales is standing by the telephone with the
24 telephone in his hand. You're doing your job watching him.
25 You don't expect Mr. Gonzales to say anything. You don't --

1  you're not expecting a statement. And then he makes a
2  statement to you in a low voice, your testimony. Isn't it
3  possible, Mr. Kennimer, that you misheard what he said?
4  A. First off, sir, he wasn't standing by the telephone when
5  he said it. He was standing by the -- he was about maybe
6  ten feet away -- five/ten feet away from the phone.
7  Q. Five/ten feet away from you, right?
8  A. From the phone.
9  Q. How far away from you was he?
10 A. Probably about maybe two feet.
11 Q. But he spoke in a low voice?
12 A. Yeah. It wasn't a whisper, it was a low -- He wasn't
13 yelling. He wasn't shouting. It was -- a little bit lower
14 than normal tone.
15 Q. And you weren't expecting him to say anything?
16 A. No, sir.
17 Q. Isn't it possible that you misheard what he said?
18 A. No, sir.
19 Q. You don't make mistakes, right?
20 A. I'm a human being. I make plenty of mistakes.
21 Q. And you made a mistake in this instance, didn't you?
22 A. As far as hearing him say what he said?
23 Q. Yes.
24 A. No.
25 Q. All right. Now, Mr. Kennimer, you testified earlier

1  that when you had this job, that this job was -- as a jail
2  guard, was sort of a come down for someone who had been in
3  the military intelligence, who thought about becoming a law
4  enforcement officer. In this instance, you were able to do
5  something that a law enforcement officer does. Isn't that
6  correct? You provided some vital information about a big
7  case.
8  A. I didn't know what the situation was at the time. I
9  didn't know what his case was or anything.
10 Q. Well, once you --
11 A. I just did my job, sir.
12 Q. I understand that. But what I'm saying, isn't it a fact
13 that in this instance, once he did tell you, whatever it is
14 that he said to you, that that was a very important piece of
15 evidence, you knew that it was a big development, an
16 important thing, you knew it was very important at the time,
17 didn't you?
18 A. When he said -- after he said his remark, yes, I did,
19 sir.
20 Q. All right. And, as I said, that gave you a chance to do
21 what you would have hoped to do at one time in life: Play a
22 role in law enforcement.
23 A. No, sir. I just did my job and reported the incident as
24 it occurred, sir. I wasn't hoping for any pat on the back
25 or anything. I just did my job.

Q. You don't think that you were playing the role of a law enforcement officer here?

A. I was doing my job as a corrections officer, sir.

Q. Is it your job as a corrections officer to initiate conversations with inmates and get statements from them?

A. Initiate comments -- conversations as to why they're there? No. To calm and diffuse the situation, yes. That's my job.

Q. Isn't it a fact that in this case you initiated a conversation with Mr. Gonzales --

MR. DUNCAN: Objection. Asked and answered.

THE COURT: I'll sustain.

BY MR. LOSCH:

Q. I put it to you, Mr. Kennimer, that you heard what you wanted to hear, that you are an ambitious man, that you have always wanted to be a law enforcement officer --

MR. DUNCAN: Objection, Your Honor. This is not a question. It's a statement.

MR. LOSCH: I'm --

THE WITNESS: May I comment, Your Honor?

MR. LOSCH: I'm turning it into a question. I'll withdraw the question.

THE COURT: Okay.

MR. LOSCH: I pass the witness.

THE COURT: Okay. And -- That's fine. I just want

to make sure I understand one thing from Mr. Kennimer.

THE WITNESS: Yes, sir.

THE COURT: Kennimer. Mr. Kennimer, when Mr. Gonzales was brought into the booking station. Is that correct?

THE WITNESS: Yes, sir.

THE COURT: Did you -- Did you understand where he had been when he was brought in?

THE WITNESS: I didn't know anything about the case. At the time, sir, when it happened, I was in the back doing my rounds and had the hourly rounds. I didn't know he was even brought in. I was called on the radio. We have a person coming in. I walked up to my assigned station. When I walked up to the assigned station, I was about maybe fifteen, twenty feet away. There's a room that we use for taking photos, snapshots, fingerprints, such forth. Mr. Snow, and I don't remember who the Texas Ranger was, what's his name, were sitting at the table and they were talking to the man.

THE COURT: Okay. But you don't know if he had just been brought up -- brought from off the street or brought from interrogation. You didn't know --

THE WITNESS: No, sir.

THE COURT: -- where he had been brought from?

THE WITNESS: No, sir.

THE COURT: Okay. And was this just being handled the way all bookings were in sort of a matter of fact way?

THE WITNESS: No, sir. Usually if they had any questions or interrogation afterwards, they would take them up to the interrogation room or something.

THE COURT: So, normally the booking process occurs first and then interrogation afterwards?

THE WITNESS: Right.

THE COURT: But was there anything unusual about this particular booking that you can recall?

THE WITNESS: Not that I can recall, sir.

THE COURT: Okay. And there was nothing unusual for Detective Robertson to ask you to escort Mr. Gonzales to make his phone call, was there?

THE WITNESS: No, sir.

THE COURT: And there was nothing unusual happened in regard to the phone call?

THE WITNESS: No, sir.

THE COURT: Okay.

THE WITNESS: They were just monitoring for security, he didn't say, "I'm in cell block so and so or I'm getting ready for the doctor", whatever the situation may be.

THE COURT: Okay. Thank you for that conversation. Yes, sir, Mr. Duncan.

CROSS-EXAMINATION

BY MR. DUNCAN:

Q. Mr. Kennimer, on the day that Michael Dean Gonzales was arrested, where were you when you first saw Mr. Gonzales?

A. I was approaching the booking station, sir. My booking sergeant advised me we have a person here. I turned around and that's when I saw Snow and the Texas Ranger seated by Mr. Gonzales on the table.

Q. So, Mr. Gonzales was seated at the time?

A. Yes, sir.

Q. And Robertson and the ranger were there with him?

A. Yes, sir.

Q. Were they talking to him?

A. Yes, sir.

Q. Could you hear what they were saying?

A. No, sir.

Q. Could you tell the tone of conversation?

A. Not the tone, sir, but just by their -- by their gestures, their hand movements and --

Q. What impression did you get from those gestures?

A. The impression I got was the experience I had they were getting frustrated. They were trying to keep their cool yet maintain their professionalism. Mr. Gonzales was sitting there. I couldn't tell if he had answered any questions or not. Like I said, I don't know.

1  Q. Was Mr. Gonzales agitated also?
2  A. It appeared he was upset, yes, sir.
3  Q. So, all three of the people at the table were upset?
4  A. Yes, sir.
5  Q. Did you book in Mr. Gonzales yourself?
6  A. Not that I recall, sir.
7  Q. Okay. Had he already been booked in when you got
8  involved?
9  A. I'm not too sure, sir. I assume he was because they
10 told me the take him back to the cell.
11 Q. Okay. So, you did not take his fingerprints?
12 A. No, sir.
13 Q. You did not take his photograph?
14 A. No, sir.
15 Q. Do --
16     THE COURT: Let me just interrupt. I'm sorry. You
17 were told to take him -- So, after that process, you took
18 Mr. Gonzales back to his cell?
19     THE WITNESS: Yes, sir.
20     THE COURT: Okay. Thank you.
21 BY MR. DUNCAN:
22 Q. When somebody's booked into the detention center there,
23 do they -- are they booked in in their street clothes or do
24 you have them change into jail clothes.
25 A. When they first come in, they're put in a holding cell,

1  we take them -- they take all their property out. Inventory
2  the property, then they sit there and ask them the basic
3  questions, name, phone number, next of kin, so forth. And
4  then they're taken -- put into -- at that particular place
5  they're put in a holding cell until they're arraigned, the
6  max -- like I was telling the attorney the other day, I
7  think the most I ever saw a person there is seven days.
8  Usually they're there just like anywhere between eight, ten
9  hours to maybe three days.
10 Q. Are they in their street clothes during that time?
11 A. Yes, sir. Street clothes.
12 Q. Did Mr. Gonzales still have his street clothes on when
13 you first saw him then?
14 A. Yes, sir.
15 Q. When you took him to his cell, you never changed him
16 into jail clothes or anything like that?
17 A. No, sir. Not that I recall.
18 Q. So, when you first saw him and he was having this
19 agitated conversation with Detective Robertson --
20     MR. LOSCH: Objection, the statement of the
21 officer's testimony. There's been no testimony that he
22 heard Mr. Gonzales conversing with the officers.
23     THE COURT: Well, repeat your question so I'll --
24     MR. DUNCAN: Well, I was recapping that after he
25 had seen --

1  BY MR. DUNCAN:
2  Q. After you had seen -- when you first saw Mr. Gonzales
3  seated at the table having this agitated conversation --
4      MR. LOSCH: Objection to the statement of the
5  testimony. There's been no testimony from the witness that
6  Mr. Gonzales was conversing with the officers in his
7  presence.
8      THE COURT: Well, let's -- Let's just see if I can
9  recall. When you approached the two officers and
10 Mr. Gonzales, were they talking?
11     THE WITNESS: The officers were.
12     THE COURT: The officers were?
13     THE WITNESS: Yes, sir.
14     THE COURT: Were they talking to Mr. Gonzales?
15     THE WITNESS: I don't know. Like I said, I
16 couldn't really tell what the conversation was about or --
17     THE COURT: But you just --
18     THE WITNESS: I know they were talking. You could
19 see them moving their lips.
20     THE COURT: And they seemed frustrated to you?
21     THE WITNESS: Yes, sir.
22     THE COURT: And Mr. Gonzales seemed upset or --
23     THE WITNESS: Yes, sir.
24     THE COURT: Okay. Okay. Thank you, Mr. Duncan.
25 BY MR. DUNCAN:

1  Q. After you observed this, who approached you first?
2  A. There was -- Nobody approached me. They just made
3  gestures, go ahead -- I think it was Officer Snow that said
4  go ahead and take this guy. He wants to make a phone call,
5  let him make a phone call. And then, you know, take it from
6  there.
7  Q. How far away from where you were at that point was the
8  telephone?
9  A. From where I was standing to the phone, probably about
10 eight feet, so -- maybe not even that far.
11 Q. And you escorted Mr. Gonzales then to the telephone?
12 A. I took him to the center of the booking station right
13 there in where he -- where the booking station was where he
14 was seated on the table was probably ten, fifteen feet.
15 Q. Were any words exchanged between the two of you, even to
16 the very minimum nature of watch your step or over this way
17 or anything of that nature?
18 A. When he came out, he was upset. You could tell it in
19 his face, just the way his --
20     MR. LOSCH: Objection. Unresponsive.
21     THE COURT: Well, let's see. When he came out of
22 where, sir?
23     THE WITNESS: Out of the booking room or the -- the
24 little room they were sitting in, the fingerprint room.
25     THE COURT: To go to the phone?

THE WITNESS: Yes, sir.

THE COURT: Okay. And you said he seemed upset?

THE WITNESS: Yes, sir. He seemed upset, just his gestures, the way he was walking, his facial expressions.

THE COURT: Okay. Please continue.

BY MR. DUNCAN:

Q. At that point then, as you were giving him directions, were any words exchanged in the next room.

A. I was trying to calm him down, let him know I wasn't his enemy, I didn't do anything to him. Just to let him know that we were there to help him out or anything.

Q. Did you that with words?

A. Yes, sir. I don't recall like I said what was said; hi, bye, whatever. I just letting him know --

Q. At that time before the telephone call, did he respond to your calming words in any way?

A. The only remarks he said was in Spanish that he did it, they couldn't prove it -- they were trying the pin him --

Q. Was that before the phone call or after the phone call, sir?

A. Before the phone call, sir.

Q. And was -- was that comment if he did it -- the comment that he did it, was that directed at you?

A. We were already standing there. Like I say, I don't know if he was turned walking toward the phone when he said

it or exactly the sequence there. It was right before the phone.

Q. All right. So, after you stated some calming words and he made this comment, then you went to the telephones?

A. Yes, sir.

Q. All right. And you watched him make the telephone call?

A. Yes, sir. Because we had to get information of who he's calling for the records of the jail, you know, his number and everything.

Q. How far was it from the telephone then to his cell?

A. 50 feet. You know, I -- somewhere in that area.

Q. As you escorted him to his cell, were any further words exchanged between the two of you?

A. Not that I recall. If I said anything, it might have been just to diffuse the situation or calm him down.

Q. So, it's possible that you made some more calming statements during that period of time?

A. Sure. It was more likely.

Q. But you don't have any specific recollection?

A. No, sir. It's been too long.

Q. When we talk about the jail policy of not discussing the case, what do you understand by the term the case? When -- in context of that jail policy.

A. Not directly ask them why did they -- you know, whether -- what got you there or why were you arrested, so

forth. The main thing is if -- just to diffuse the situation because they get in arguments, you know, a lot of times you get two or three inmates brought in for the same charge or they were involved in whatever they did. So, you are trying to calm them down -- You're trying to find out for classification purposes where to put someone so you don't put two enemies in the same cell, so to speak.

Q. So, other things about their arrest in general, if they're mad about the officer that arrested them or the conditions of their booking, would those be fair game to discuss?

A. Yes, sir.

Q. And in calming somebody down, you might need to discuss those things?

A. Yes, sir.

Q. In classifying the person you might need to discuss those things?

A. Definitely.

Q. Okay. So, when you talk about the case, that specifically just means the circumstances of the crime they just committed?

A. Right.

MR. DUNCAN: Pass the witness, Your Honor.

THE COURT: Approach, please. If everyone will approach over here a moment.

(Bench.)

THE COURT: Let me say, the testimony of Mr. Kennimer is hopelessly confused. We could go back over this for I think hours and not get anything straight. I mean, he is testifying just in every direction. I mean, I -- I don't know what the lawyers want to do, but the petitioner has got him saying one thing and the Government, the State, has him saying another thing, and I have a feeling we will continue this process for hours. So, I --

MR. LOSCH: May I ask the Court a question?

THE COURT: Okay.

MR. LOSCH: This may not be a fair question. But your comment is a little bit one that I've been -- I've had to deal with before. Is the Court saying that I've demonstrated to the Court's satisfaction that had this type of impeachment been done at the trial it would have come out like this or do I need to do more to prove that?

THE COURT: Well, I can't -- I realize you're --

MR. LOSCH: That's what I have to do.

THE COURT: I realize you're nervous, but all I can tell you is I just see us going for another thirty or forty minutes with the same kind of testimony.

MR. LOSCH: Let me ask --

THE COURT: If there's some -- If there's some new approach you want to take, I'll let you take it, but --

00451

MR. LOSCH: Let me ask it this way, and I realize where you're going. Does the Court feel that it has -- Assuming that it continues to go this way, I agree that it would, does the Court feel that it has all the information that it needs to decide what his testimony would have looked like at the trial had these impeachment materials been used?

THE COURT: I do believe I do have that information.

MR. LOSCH: On that basis, if the State is agreed, I'm willing to terminate the questioning.

MR. DUNCAN: Assuming we get to make our arguments about this.

THE COURT: Yes.

MR. DUNCAN: And as far as the evidence, I'm ready to cut it off.

THE COURT: Okay.

MR. LOSCH: Thank you.

THE COURT: Thank you.

(Open court.)

MR. LOSCH: I pass the witness and I have no further questions.

MR. DUNCAN: Nothing further, Your Honor.

THE COURT: Mr. Kennimer, we appreciate your attendance at trial and you can be excused from any further attendance.

THE WITNESS: Have a good day.

THE COURT: You have a good day as well. Now, it's -- we're almost ready for the noon recess, but I have -- I have to take a matter up that is very collateral to this case, but I'll just do it in open court so everyone will understand the matter.

Mr. Luck, can you approach the podium? Mr. Luck is one of our Pretrial Services officers who works with people who are, of course, on bond waiting trial. Something unusual happened yesterday in regard to Detective Thomas's testimony. At least it was reported to me that you were taping that testimony. Do I understand that to be correct?

PRETRIAL SERVICES OFFICER: No, sir. When I went to check the equipment to see if everything was working okay, he said that he wanted to tape that conversation or whatever was going on at that time and I mentioned to Ms. Galindo that's what he had told me, that he --

THE COURT: That he wanted to tape the conversation? That Mr. Thomas did?

PRETRIAL SERVICES OFFICER: Yes, sir.

THE COURT: Okay.

PRETRIAL SERVICES OFFICER: If that's who it was that I was talking to.

THE COURT: Okay. And was -- and then you informed him that there was no way it could be taped? Is that --

PRETRIAL SERVICES OFFICER: No, sir. I didn't say anything about that one way or the other. I just told him I would have to talk to somebody else. I had nothing to do with it.

THE COURT: Do you know Detective Thomas?

PRETRIAL SERVICES OFFICER: I have just seen him before. I don't know that I have personally met him. I think maybe I've seen him on tv or something like that.

THE COURT: Well, the only reason I'm asking, I just need to make sure I know what's going on.

PRETRIAL SERVICES OFFICER: Yes, sir.

THE COURT: And if somebody is taping part of the court proceedings, somebody should notify me of that.

PRETRIAL SERVICES OFFICER: Oh, yes, sir. He said something about a videotape so they could use it for some type of training situation or matter or something like that.

THE COURT: Okay.

PRETRIAL SERVICES OFFICER: Through the police academy I guess or whatever it was he was involved with.

THE COURT: But you're telling me that you did not tape it and --

PRETRIAL SERVICES OFFICER: Oh, no, sir.

THE COURT: And you don't know if anybody did tape it?

PRETRIAL SERVICES OFFICER: No, sir. I don't know if anybody taped it.

THE COURT: Well, I'll check with Mr. Frye as well. I'm not suggesting there's been anything inappropriate done here. If something's happening in the courtroom that relates to the trial, I simply need to know about it.

PRETRIAL SERVICES OFFICER: Yes, sir.

THE COURT: And if the testimony's being taped, I need to know about it and, frankly, I need to make sure the lawyers need to know about it.

PRETRIAL SERVICES OFFICER: Oh, certainly.

THE COURT: So, I -- I appreciate your clarifying the matter. But you're your telling me you didn't tape Detective Thomas's statement?

PRETRIAL SERVICES OFFICER: Oh, no, definitely.

THE COURT: And you don't know of anybody that did.

PRETRIAL SERVICES OFFICER: No, sir.

THE COURT: Thank you very much.

MR. LOSCH: Could the Court --

THE COURT: Thank you very much, Mr. Luck

MR. LOSCH: -- check if possible there's no taping capability on the other end that the Court is unaware of? They have the same access to monitors over there and if the Court feels that -- And I agree, that if there's taping being done of the Court, the lawyers ought to be aware of it. Maybe an inquiry should be initiated.

00452